IN THE MATTER OF: DR. REGINALD A. HAWKINS
IN THE MATTER OF: DR. JOHN P. STINSON
IN THE MATTER OF: DR. GEORGE T. NASH

No. 7226SC348

(Filed 21 February 1973)

1. **Physicians, Surgeons and Allied Professions § 6— hearing before Dental Examiners — absence of bias**

    In this proceeding before the State Board of Dental Examiners to determine whether the licenses of three dentists should be revoked or suspended because of alleged substandard dental work and discrepancies between charges for work and work actually performed under a federally financed program that furnished dental treatment to medically indigent school children, the record fails to show any prejudice or bias on the part of any member of the Board toward any respondent by reason of a suit brought by one respondent to integrate racially the North Carolina Dental Society or for any other reason.

In re Hawkins

2. **Physicians, Surgeons and Allied Professions § 6— suspension of dentists' licenses upon conditions — remand for proper judgment — suspension for definite terms — no unconstitutional increased penalty**

Where the State Board of Dental Examiners originally suspended each respondent's license to practice dentistry in North Carolina subject to the condition imposed of pursuing specified courses of dental study, and the superior court set aside the suspensions on the ground that the Board had no authority to impose such a condition and remanded the proceeding for entry of a proper judgment, the Board's subsequent order suspending respondents' licenses for periods of 60 days, 12 months and 18 months, respectively, did not constitute an unconstitutional imposition of a more severe penalty than that originally imposed since (1) there was no appeal resulting in a new trial as in *North Carolina v. Pearce*, 395 U.S. 711, and (2) the order upon remand did not actually impose a more severe penalty as the original suspensions could have become permanent had respondents not complied with the condition imposed.

3. **Physicians, Surgeons and Allied Professions § 6— suspension of dentist's license — constitutionality of statute**

The statute providing for the revocation or suspension of a dentist's license whenever it shall appear to the State Board of Dental Examiners that such dentist "has been guilty of malpractice . . . or has been guilty of willful neglect in the practice of dentistry . . . or has been guilty of any other unprofessional conduct in the practice of dentistry" is not unconstitutionally vague and indefinite. Former G.S. 90-41.

4. **Physicians, Surgeons and Allied Professions § 5— federally financed dental program — participating dentists not exempt from dental statutes**

Dentists in general practice who performed dental services under a federally financed program of the local school board that furnished dental treatment to medically indigent school children were not employees of a federal agency "in the discharge of their official duties" within the meaning of the statute exempting such employees from statutory provisions regulating the practice of dentistry. G.S. 90-29.

5. **Physicians, Surgeons and Allied Professions § 6— suspension of dentists' licenses — sufficiency of evidence**

The evidence was sufficient to support findings of fact by the Board of Dental Examiners which, in turn, support the Board's judgment suspending the licenses of three dentists for malpractice, willful neglect and unprofessional conduct because of substandard work and discrepancies between charges for dental work and work actually performed under a federally financed program that furnished dental treatment to medically indigent school children.

APPEAL by respondents from *Friday, Judge,* 18 October 1971 Session, Superior Court, MECKLENBURG County.

This appeal results from the following proceedings:

On 29 June 1966, a letter from the Charlotte-Mecklenburg Board of Education was sent to all dentists practicing in the Charlotte-Mecklenburg area advising that funds had been made available to the Board of Education under the Elementary and Secondary Education Act (Federal) for the purpose of furnishing dental treatment to children from low income families or who were medically indigent. The addressees were requested to advise whether they desired to participate, and a return card was enclosed for that purpose. The letter advised that the parents of the children would be given a choice as to where and by whom their children would be treated. The addressees were further advised that they would be allowed to charge their customary and usual fees and payment would be made promptly upon receipt of their statement for services. Appellants were among the 36 dentists who responded affirmatively. When the screening of the children had been completed, parental consent and choice of location and person to perform the services obtained from the parents, the dentist was sent an authorization letter authorizing him to treat a named child and advising that routine prophylaxis, topical fluoride, X rays, and extractions could be performed without further authorization but that any unusual treatment or procedure "may be approved by the Dental Director." The letter further advised that the work must be completed and statement mailed prior to 25 August 1966, but that no bill should be submitted for work to be done in the future, only completed work. The dentist was asked to indicate on his statement whether the child needed more care at that time.

Following receipt of all the bills, it was suggested to Mr. James T. Burch, employee of the Board of Education and Director of ESEA Activities that the charges of some of the dentists appeared to be excessive. This suggestion came from a member of the staff of the Health Department, an agency working closely with the Board of Education in this program. Subsequently, this information was passed on to Dr. Craig Phillips, Superintendent of Charlotte-Mecklenburg Schools. Dr. Phillips; Dr. Sherrill, Dental Director; and Dr. Camp, Medical Director of the Health Department, conferred after some preliminary evaluation of the work done had been made. It was decided that the dental services performed on other children in the program should be evaluated. This evaluation was done. The four dentists identified as the result of the preliminary evaluations were called

to Dr. Phillips' office for conference. The regional office and Washington office of the Office of Education, upon being informed of the problem, advised Mr. Burch that the problem was "a local responsibility in terms of the administration of the program and in terms of the evaluation of the program." Dr. Phillips then turned to the North Carolina Dental Society. As a result of his discussion with the President of the Dental Society, the request was made that a qualified review committee of dentists be organized to investigate the matter further. This was done and this committee will hereafter be referred to as the "six-man committee." The six-man committee asked that arrangements be made for them to re-examine the children. This was done and in October 1966, 488 children were re-examined at the Dental Clinic at the Central Piedmont Community College. Discrepancies found were reported to the Board of Education.

Subsequently, and on 21 December 1966, the North Carolina State Board of Dental Examiners subpoenaed all of the investigative records and materials then held by the Charlotte-Mecklenburg Board of Education. This action was taken pursuant to the provisions of G.S. 90-27. The Board of Dental Examiners secured the services of Dr. Clifford M. Sturdevant, Professor of Operative Dentistry, School of Dentistry, University of North Carolina at Chapel Hill; Dr. Fred Charles Fielder, Professor of Operative Dentistry, Meharry Medical College, Nashville, Tennessee; and Dr. Herman Gaskins, Professor of Operative Dentistry, School of Dentistry, Howard University, Washington, D. C. These gentlemen are hereafter referred to as the "reviewing committee" when referred to collectively. The reviewing committee was requested to review the records of the appellants and other dentists participating in the program in conjunction with a review of the report previously filed by the six-man committee. In the process of evaluation by the reviewing committee a system was devised using numbers rather than names of dentists in order that identity of the dentist involved would not be known to the reviewing committee. Following their examination of records and the clinical review of some of the patients, the reviewing committee submitted their report to the Board of Examiners. Their report verified a number of discrepancies attributed to appellants by the six-man committee and exonerated one dentist, Dr. John Reynolds, against whom the six-man committee had listed two discrepancies.

After considering the report filed, the Board of Examiners, acting under the provisions of G.S. 90-41, caused to be served

on each of the appellants by the Sheriff of Mecklenburg County notice advising each that "[t]he North Carolina State Board of Dental Examiners has sufficient evidence which, if not rebutted or explained, will justify the said Board in permanently or temporarily revoking or suspending your license to practice dentistry in North Carolina." The notice set out seriatim the general nature of the evidence referred to; advised that unless hearing was requested within 20 days of service of the notice, action would be taken by the Board which would be final and not subject to judicial review; that if requested, hearing would be held not less than 10 nor more than 30 days from the date of notification; that all proceedings would be in accordance with the provisions of Chapter 150, General Statutes of North Carolina and "under the authority of Chapters 451 and 452 as enacted by the 1967 North Carolina General Assembly," and that the notice was given pursuant to resolution duly considered and adopted by the Board.

Each appellant filed a "request for hearing and response to notice." They were identical in form and content. Each contained the following motions: (1) that "the hearing be held before an impartial board, tribunal or committee, selected pursuant to the laws of the State of North Carolina and without regard to race, color or national origin"; (2) for a bill of particulars as to the charges against the movant; (3) that the Board furnish the movant with the "names and addresses of all persons, institutions or agencies participating in the bringing and investigation of the charges contained in the Notices (sic) and of the names and addresses of all persons and of exhibits or documents upon whose testimony the Board intends or expects to rely in support of the charges contained in the Notice"; and (4) "for an order allowing the pretrial adverse examination of all persons participating in the bringing or investigation of the charges contained in the Notice or who are expected by the Board to testify in support of the charges and allowing the Respondent to examine all exhibits or documents upon which the Board expects or intends to rely in support of the charges."

The Board then filed a "notice of hearing" in answer to each appellant's "response to notice and request for hearing." The notice set the hearing for 20 September 1967 at 9:30 a.m. in the United States District Courtroom in Charlotte. The Board in the notice denied the first motion; allowed the motion for a bill of particulars and set out seriatim and with particularity the

charges against the particular dentist on whom the notice was served; denied the motion for adverse examination but, on its own motion, allowed each respondent the right to take the depositions of all witnesses pertaining to any matters relevant to the proceeding upon terms and conditions set out therein; granted the motion for examination of documents and exhibits; allowed the third motion set out above; and set out in the notice the information requested.

Upon request of respondents, the hearing was continued from 20 September to 29 November 1967.

Each respondent filed a response to the notice of hearing in which each requested additional particularized information with respect to the charges and objected and excepted to the ruling of the Board denying his original motion that the hearing be held before an impartial board, tribunal or committee.

The matters were consolidated for hearing, and hearing before the Board was begun on 29 January 1968 and concluded on 5 March 1968.

Pleadings were read into the record. Respondents renewed their request for more definite statements of the charges and for hearing before an impartial board or committee. Prior to the taking of evidence the parties entered into certain stipulations as follows: (1) that the transcripts of depositions previously taken on motion of respondents could be received in evidence as the sworn testimony of the deponents, those depositions being the testimony of Dr. Luby T. Sherrill, Dr. A. Craig Phillips, Mr. James Burch, Dr. J. H. Guion, Dr. Paul Stroup, Jr., Dr. J. H. Rehm, Dr. C. E. Sturdevant, Dr. Fleming Stone, Dr. Worth Williams, Dr. Barry Miller, and Dr. Herman E. Gaskins; (2) that the X rays to be used in the hearing, previously used in the deposition hearing, might be received and introduced into evidence without the necessity of technical authentication; that the X rays were authentic, depicted the mouth and teeth of the person whose name appeared on the X-ray mounting and were in fact, made of the mouth and teeth of the person whose name appeared on the mounting; that the name of the person on the X-ray mounting was the same person named on the bill and statement as having been treated by respondents with the exception of Mary Sanders and Lara Ann Huston as to whom respondents did not make the above stipulation; (3) that certain duplicate original bills might be introduced into evidence in lieu

of the originals; (4) that the initial investigation of alleged discrepancies was done by a six-man review committee, composed of Dr. Paul Stroup, Dr. J. H. Rehm, Dr. Fleming Stone, Dr. Worth Williams, Dr. Barry Miller, and Dr. J. D. Martin, all dentists practicing in Mecklenburg County; that of that group Dr. Worth Williams and Dr. J. D. Martin are Negroes; that their report was submitted 27 October 1966 and was marked as Exhibit No. 5; (5) that Board's Exhibit No. 6, "Identification of Dentists by Number" shows an identifying list by number of the dentists participating in the ESEA program and that the numbers thereon are the same identification numbers appearing in the report of the six-man review committee; (6) that the report dated 21 February 1967 and supplemented by report and attachments dated 6 March 1967 is the further written report made and submitted by Dr. Fred C. Fielder, Dr. Herman E. Gaskins, and Dr. C. E. Sturdevant, marked as Board's Exhibit No. 7; (7) that the testimony of Dr. Lindahl, Dr. Sturdevant, Dr. Fielder, and Dr. Gaskins might be taken with their sitting in a panel rather than individually; (8) that the numbers assigned to respondents and to their case records for the six-man investigation purpose was: Dr. Reginald A. Hawkins, 13; Dr. George T. Nash, 22; Dr. John P. Stinson, 29.

Upon the conclusion of the hearing the requirement of G.S. 150-20 was waived, and it was agreed that the Board's decision should be rendered within 60 days after the Board received the written transcript of the proceedings. On 30 July 1968, the decision of the Board relative to each respondent was rendered. As to each respondent, the Board entered findings of fact and conclusions of law and, subject to conditions imposed of pursuing courses of study, ordered the suspension of each respondent's license to practice dentistry in the State of North Carolina. From the orders entered, each respondent filed written exceptions and appealed to the Superior Court, Mecklenburg County, and filed an application for stay. Stay order as to each respondent was entered by Judge Fred Hasty on 15 August 1968.

On 1 February 1971, hearing was had before Judge A. Pilston Godwin at the conclusion of which it was stipulated that order could be entered out of term. On 20 March 1971, Judge Godwin entered an order as to each respondent. The order in each instance affirmed the Board's findings of fact relative to patients treated with the exception of the findings relative to one Treva Watts, a patient of respondent Dr. Nash. It set aside the portion

In re Hawkins

of the order suspending license to practice dentistry upon failure to comply with certain conditions therein imposed upon the basis that, in the opinion of the court, the Board lacked authority to suspend, upon conditions imposed, the penal provisions of its orders entered pursuant to G.S. 90-41. It remanded the cause to the Board "for reconsideration and for the entry of an appropriate lawful order." It provided that upon service of the order entered upon respondents, each should have the right to appeal to the Superior Court "to the end that a judicial hearing may be conducted and a determination made regarding the legal efficacy of the hearing conducted by the Board as the same relates to the prior motion of the Respondent for a hearing before 'an impartial Board, tribunal or committee.' " The order stayed the effectiveness of any punitive order entered pending determination to be made upon any appeal therefrom. Except as set forth therein, each respondent's exceptions were overruled and the decision of the Board affirmed. The record contains no objection to the entry of any of the orders or any part of any. At the end of each order reproduced in the record a numbered exception appears.

On 20 May 1971, the Board entered an order as to each respondent. The order as to Dr. Hawkins suspended his license for a period of 12 months, and was served on respondent Dr. Hawkins on 26 May 1971. The order as to Dr. Stinson suspended his license for a period of 60 days and was served on him 26 May 1971. The order as to Dr. Nash suspended his license for a period of 18 months and was served on him on 28 May 1971.

On 9 June 1971 each respondent filed notice of appeal and exceptions to the order entered. Respondents contended that the orders entered unconstitutionally imposed increased punishment, that they had been deprived of their right to appear before the Board for further hearing relative to punishment to be imposed, and that no further and additional findings were made by the Board to support the punishment imposed.

On 30 August 1971 a hearing was had before Judge John R. Friday. Respondents presented evidence which they contended indicated bias, prejudice, or lack of impartiality on the part of the North Carolina State Board of Dental Examiners. This evidence consumes 142 pages of the record. At the conclusion of the hearing, counsel for respondents was asked by the court to "dictate to the Reporter the Issues that you feel arise in this case." Counsel thereupon stated the issues in the

case as (1) whether the Board of Dental Examiners which conducted the hearings, both initially and on remand, was a fair and impartial tribunal to hear the matter and whether the hearing was conducted in a fair and impartial manner; (2) whether the Board violated the constitutional rights of respondents in failing to allow them to appear and present argument on remand, prior to the imposition of its order; and (3) whether the Board violated the constitutional rights of respondents in imposing a more severe penalty on remand than the Board had previously imposed.

On 2 September 1971, Judge Friday entered an order as to each respondent retaining jurisdiction of the cause for a period of 30 days for determination of the issue raised by respondents as to the impartiality of the North Carolina State Board of Dental Examiners and the conduct of the original hearing before the Board, remanding the causes to the Board "to the sole end that the board shall give the respondent an opportunity to appear before said board, personally or by counsel, for the restricted purpose of presentation of argument upon the matter of penalty or penalties to be imposed upon respondent by said board; and that no conclusive order shall be entered by said board herein until respondent is afforded the above said opportunity"; and reserving determination of respondent's exception as to increased punishment until entry of order by the Board.

On 30 September 1971, after hearing at which respondents and counsel were present in person and presented argument, the Board entered orders and in each case imposed identical punishment as was imposed in its previous order. Each respondent filed written exceptions and notice of appeal.

The causes were again heard before Judge Friday on 18 October 1971. A transcript of the last hearing before the Board was, upon request of counsel for respondents, made a part of the record. At that hearing, counsel for respondents requested that the record reflect an exception to the ruling of the court with respect to affirming the order of the Board. Counsel for respondents stated further: "Would like for the record to further reflect our specific exceptions to the findings of the Board, Findings of Fact, that were previously set out in the matter heard by Judge Godwin. We would also like for the record to reflect our specific exceptions to the findings of Judge Godwin affirming the findings of the Board, affirming the finding of facts of the Board, and the conclusions of law."

In re Hawkins

The court entered an order as to each respondent in which he set out the order of the Board, that respondents appealed to the Superior Court; that after hearing the court entered an order affirming the Board's findings of fact and conclusions of law; determined that the conditional order of license suspension was in excess of the Board's statutory authority, remanded the proceeding to the Board for the entry of an appropriate order, and required a subsequent judicial hearing for the determination of respondent's motion for a hearing before an "impartial Board, tribunal or committee"; that on remand the Board entered an order of license suspension; that respondents again appealed noting two exceptions, both alleging violation of constitutional rights; that a hearing was had in Superior Court upon this appeal and evidence taken with respect to the lack of impartiality of the Board; that the court again remanded the proceeding to the Board for the restricted purpose of allowing respondents to be heard with respect to the penalty or penalties to be imposed and retained jurisdiction and reserved ruling with respect to the issues raised of impartiality and violation of constitutional rights by increased severity of penalty; that the Board heard respondents and entered orders imposing the identical license suspensions previously imposed; that respondents again appealed noting as exceptions the contentions that the penalty imposed exceeded the original penalty and was not supported by any findings made by the Board. The court noted that the issues before it were (1) determination of the issue of impartiality of the Board of Dental Examiners, (2) decision as to the exception alleging that penalty in order of 20 May 1971 violated respondents' constitutional rights by exceeding in severity the penalty imposed by the Board's original order, and (3) failure of the Board to make findings of fact to support punishment imposed. The court found that respondents had failed to present any evidence that the Board of Dental Examiners had acted in any capacity other than that of an "impartial Board, tribunal, or committee" in the conduct of the hearing and of all matters relating thereto, that the penalties of the orders of 28 September 1971 did not violate rights of respondents by exceeding the severity of the penalty imposed by the original order of the Board, that the order of 28 September 1971 was based upon the original findings of fact and conclusions of law and no additional findings were necessary. The court, therefore, overruled respondents' exceptions and affirmed the order of the North Carolina State Board of Dental Examiners. Each respond-

ent appealed. During the entire pendency of this proceeding all orders affecting licensure of respondents have been judicially stayed.

*Patton, Starnes and Thompson, by Thomas M. Starnes, for North Carolina State Board of Dental Examiners.*

*Chambers, Stein, Ferguson and Lanning, by J. LeVonne Chambers, for respondent appellants.*

MORRIS, Judge.

Respondents bring forward 13 assignments of error based on 117 exceptions. All assignments of error are common to all three respondents.

[1] Assignments of error Nos. 1 and 13 are addressed to the alleged lack of impartiality of the Board of Dental Examiners. Incorporated in respondents' "request for hearing and response to notice" was a motion "that the hearing be held before an impartial board, tribunal or committee, selected pursuant to the laws of the State of North Carolina and without regard to race, color or national origin." The Board denied the motion "for the reason that the North Carolina State Board of Dental Examiners is a lawfully and constitutionally organized agency of the State of North Carolina and is the sole lawful body or agency having jurisdiction of the subject matter of this proceeding."

Although respondents contend that the statute under which this proceeding was brought and conducted is unconstitutional, they do concede the authority given by statute to the Board to conduct the hearing. They urge that they are entitled to a hearing before a fair and impartial group. We certainly are in accord, nor does the Board challenge the correctness of this position. The Board does, however, deny that this right was denied respondents. Respondents contend that the Board was biased from the very beginning to the very end of the proceeding and that prejudice resulted to respondents not only in the weighing of the evidence by the Board but in the institution of the proceeding and in the disposition made by the Board based on the findings. Respondent Hawkins had been active as a plaintiff in suits challenging the alleged discriminatory practices of the North Carolina Dental Society and Board of Dental Examiners and the Charlotte-Mecklenburg Board of Education. A white dentist was among those against whom discrepancies were listed

by the six-man committee, but the reviewing committee found that there were no discrepancies. The members of the Board were selected by vote of the members of the North Carolina Dental Society. These circumstances, say the respondents "demonstrate that the board did not act as a disinterested and impartial body in instituting these proceedings nor could it act as a fair and impartial tribunal to conduct the hearings and to render a disposition of the matter." We are not willing, as respondents apparently would have us do, to say that a mere allegation and statement that prejudice exists is sufficient proof that the proceedings were conducted with a lack of impartiality and fairness. In their brief, respondents point to no evidence in the record indicating bias or partiality, nor does our study of the record reveal any. It is true that prior to the suit of respondent Hawkins against the North Carolina Dental Society [*Hawkins v. North Carolina Dental Society*, 355 F. 2d 718 (4th Cir. 1966)], the members of the Board of Dental Examiners were elected by the members of the North Carolina Dental Society and that no black dentist was a member of that Society. However, in 1961, G.S. 90-22 was amended to provide that members of the Board of Dental Examiners shall be elected in an election conducted by the Board "in which every person licensed to practice dentistry in North Carolina and residing in North Carolina shall be entitled to vote." G.S. 90-22(b). The statute further provides that each year there shall be elected two members for three-year terms. Nominations are made by a written petition signed by not less than ten dentists licensed to practice in North Carolina and filed with the Board within the time provided by G.S. 90-22(c)(4). Dr. Hawkins testified that he became a member of the North Carolina Dental Society in May 1966, prior to the time of his participation in the ESEA program resulting in the charges against him. He further testified that he had voted for candidates for the Board of Dental Examiners, that he had never been a candidate for election to the Board, but that he had attempted to become a candidate in 1961 and in 1966 at the June meetings of the Old North State Dental Society. He testified: "I could have found a hundred who were willing to endorse me but because of the difficulty and the costs involved and looking at practical politics, I was deterred from seeking that course. Other black dentists deterred me." The members of the Board were elected by ballots cast by all licensed dentists in North Carolina who cared to vote—not by the North Carolina Dental Society. We

find no evidence in the record before us which would indicate any prejudice or bias on the part of any member of the Board toward any of the appellants by reason of the suit brought against the Dental Society or for any other reason.

The proceeding from beginning to end was conducted fairly and impartially. Mr. James T. Burch, who is black, was employed by the Charlotte-Mecklenburg Board of Education and was Director of ESEA activities in 1966. Under his supervision a letter was sent by the Board of Education to all dentists practicing in the Charlotte-Mecklenburg area asking that the addressee advise as to their desire to participate in a program of dental treatment of medically indigent children during the summer of 1966, funds for the program having been made available under the Elementary and Secondary Education Act (Federal). The respondents, with some 33 other dentists, indicated an interest. The program was fully administered by and under the control of the Charlotte-Mecklenburg Board of Education with the cooperation of the Charlotte-Mecklenburg Health Department. Upon the conclusion of the program of dental treatment, Mr. Burch was advised by an associate working with the program that some of the bills appeared to be excessive. Mr. Burch communicated this information to Dr. Craig Phillips. Dr. Phillips conferred with Dr. Luby Sherrill, Dental Director of the Health Department, and Dr. Camp, Medical Director of the Health Department. Dr. Sherrill and one or more assistants conducted a preliminary investigation and evaluation. They discovered instances of substandard dentistry and discrepancies between treatment apparently rendered and treatment reflected on some of the statements submitted. This was reported by Mr. Burch to Dr. Phillips who, in turn, transmitted the report. Both the State Department of Public Instruction and the Federal Office of Education advised that problems of administration and evaluation of the program were local problems. Dr. Phillips then requested Dr. Homer Guion, President of the North Carolina Dental Society, to appoint a qualified review committee of qualified dentists to investigate the matter further. This was done. The committee was composed of six local dentists, two of whom were black. Mr. Burch met with the committee as a representative of the Board of Education. Mr. Burch assigned numbers to the participating dentists and their statements and records. Evidence from committee members was that never at any time did any member of this committee know the name of any doctor whose work they were reviewing. The

records were kept locked up by Mr. Burch and no one saw them. They did not know any names when their report was submitted. One member of the committee testified that he did not know any names of the doctors involved until he read it in the newspaper. The committee members convened at Central Piedmont College on or about 6 October 1966 where they clinically examined all of the children who had been treated in the program whom Mr. Burch could locate in the school system and have transported to the College. On the same day X rays were made of the teeth of the children who were examined. The chart and X ray of each child was marked with his or her name and an identifying number. Mr. Burch assigned each participating dentist a number. That number was placed in one corner on the outside of the envelope which contained the chart, X ray and statement which pertained to that child. Each time the committee met for joint review, Mr. Burch was present and at the close of the meeting took possession of all the envelopes and retained them in his possession until the next meeting. The committee decided upon those items of substandard dentistry which they would label a discrepancy. There were five discrepancies listed by them. The committee examined 308 of the 601 patients who had been treated by private dentists. The committee reported to Dr. Guion who submitted their report to Dr. Phillips by letter dated 27 October 1966. Thereafter Dr. Phillips conferred several times with each of the respondents with their counsel, and agreement was reached with respect to the amount of payment to be made for the services of each respondent. This concluded the matter insofar as the Board of Education was concerned. On 21 December 1966, the Board of Dental Examiners, by subpoena duly served, obtained all of the records, X rays, reports and related documents pertaining to all the dentists who had participated in the program. Thereafter the Board requested three experts to review the report of the six-man committee, the postoperative X rays made at the College, and all other documents relating to the four dentists reported as having discrepancies. These three experts, two of whom were black, were Dr. Clifford M. Sturdevant, Dr. Herman E. Gaskins, and Dr. Fred C. Fielder. None of them was a resident of Charlotte. Each was a professor of operative dentistry at a recognized school of dentistry. This review committee reviewed the report of the six-man committee, examined all records pertaining to the four dentists charged with discrepancies, clinically examined 13 of the children in question, and checked

random samples of the records of dentists who had not been charged with discrepancies. Their initial report was submitted on 21 February 1967. They exonerated one dentist who had been charged with two discrepancies by the six-man committee. As to respondent Hawkins, they verified 25 of the 38 discrepancies reported by the six-man committee. As to respondent Stinson, they verified 10 of 19 discrepancies reported by the six-man committee. As to respondent Nash, they verified 20 of the 33 discrepancies reported by the six-man committee. The Board, after full hearing, entered its orders finding 13 discrepancies as to Dr. Hawkins, seven as to Dr. Stinson, and 18 as to Dr. Nash. Whenever there appeared any doubt as to whether any charged discrepancy was a discrepancy, the charge was dismissed by the Board. So it appears that no charge was sustained unless it received the unanimous approval of the six-man committee, the review committee, and the Board of Dental Examiners.

The two committees utilized in the procedure totaled nine dentists. Four of them were black. The Board required complete unanimity of opinion in order to include an alleged discrepancy in its findings of fact and conclusions of law. We cannot conceive of a fairer procedure than was employed here. The respondents were given the benefit of every doubt all the way through. We perceive no bias, no prejudice, and no partiality.

[2] Assignments of error Nos. 9, 12 and 13 encompass appellants' contention that the Board erred in imposing more severe sentences on remand and the court erred in affirming. Appellants urge that the alleged increased penalties violate the rights of respondents as secured to them by the Fourteenth Amendment to the Constitution of the United States and Article I, Section 19, North Carolina Constitution.

G.S. 90-41, in effect at the time of this proceeding, provided that when one is found guilty of acts violative of the statute, "the Board may revoke the license of such person, or may suspend the license of such person for such period of time as, in the judgment of the said Board, will be commensurate with the offense committed . . . "

The Board, in its orders of 30 July 1968, ordered the suspension of each respondent's license to practice dentistry in North Carolina, subject to conditions imposed of pursuing courses of study. The Superior Court entered an order on 20

March 1971 setting aside that portion of each order upon the ground that the Board, under G.S. 90-41, had the authority only to revoke or suspend a license and had no authority to impose conditions. Whether the Board had that authority is not before us. We note that the 1971 General Assembly rewrote G.S. 90-41 to give the Board authority, in addition to revocation and suspension, to "[i]nvoke such other disciplinary measures, censure, or probative terms against a licensee as it deems fit and proper."

Respondents contend that *North Carolina v. Pearce,* 395 U.S. 711, 23 L.Ed. 2d 656, 89 S.Ct. 2072 (1969), is applicable. We do not agree. In *Pearce,* the Court was concerned with the constitutional limitations upon the imposition of a more severe punishment *after conviction for the same offense upon retrial.* The Court held that neither the double jeopardy provision nor the equal protection clause imposes an absolute bar to a more severe sentence upon reconviction but that "[d]ue process of law, then, requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial." We see no factual similarity in *Pearce* and the case *sub judice.* We have no appeal resulting in a new trial. We have here only the remand for the entry of a proper judgment within the authority of the Board. As appellee points out in its brief, the court set aside that portion of the judgment as void not because it was tainted by some error prejudicial to respondents but because the court determined that the Board did not have the legal authority to enter an order of that type. Nor can we say that the order upon remand imposed a more severe penalty. In the case of Dr. Hawkins the suspension was for 12 months; as to Dr. Nash, 18 months; and as to Dr. Stinson, 60 days. However, in the original order of the Board, the suspension in each case could have resulted in permanent suspension or revocation had respondents not complied with the conditions imposed. We hold that the orders entered upon remand do not constitute a deprivation of rights under the Constitution of the United States or the North Carolina Constitution.

[3] By assignment of error No. 6 the respondents contend that the court erred in failing to dismiss this proceeding because of the alleged vagueness and indefiniteness of the statute. Respondents apparently complain of the language "has been guilty of malpractice . . . or has been guilty of willful neglect in the practice of dentistry . . . or has been guilty of any other unprofes-

sional conduct in the practice of dentistry . . . " We agree with respondents that they are entitled to notice of the conduct which might warrant suspension or revocation. We do not agree that this language is too vague and indefinite to give notice. It is certainly not such that "men of common intelligence must guess at its meaning." *Coates v. Cincinnati,* 402 U.S. 611, 614, 29 L.Ed. 2d 214, 217, 91 S.Ct. 1686, 1688 (1971) ; *Connally v. General Construction Co.,* 269 U.S. 385, 391, 70 L.Ed. 322, 328, 46 S.Ct. 126, 127 (1926).

The whole purpose and tenor of Article 2, Chapter 90, of the General Statutes is to protect the public against unprofessional, improper, unauthorized, and unqualified practice of dentistry. The goal is to secure to the people the services of competent, trustworthy practitioners. The licensing by the State, granted only after certain standards of proficiency are met, amounts to the recognition by the State of the licensee as a qualified dentist. The continued holding of the license is taken by the public as indication that those standards are being maintained. The object of both granting and revoking a license is the same—to exclude the incompetent or unscrupulous from the practice of dentistry.

Webster's Third New International Dictionary (1968) defines "malpractice" as, "a dereliction from professional duty whether intentional, criminal, or merely negligent by one rendering professional services that results in injury, loss, or damage to the recipient of those services or to those entitled to rely upon them or that affects the public interest adversely."

In *Hazelwood v. Adams,* 245 N.C. 398, 95 S.E. 2d 917 (1957), Justice Higgins said:

"One who holds himself out to practice dentistry, by implication agrees to bring to his patient's case a fair, reasonable and competent degree of skill and to apply that skill with ordinary care and diligence in the exercise of his best judgment." (p. 401.)

The phrase "willful neglect" is certainly a well-known phrase and we cannot perceive that any uncertainty as to its meaning could exist among the members of the dental profession, those to whom the statute applies. The clear meaning of the phrase as applied to the practice of dentistry is a deliberate

purpose not to discharge some duty necessary to the proper treatment of the patient.

It is true that the statute does not set out seriatim incidences of unprofessional conduct for which license revocation would lie. In *Reyburn v. Minnesota State Board of Optometry,* 247 Minn. 520, 78 N.W. 2d 351 (1956), the Court defined "unprofessional conduct" as "conduct which violates those standards of professional behavior which through professional experience have become established, by the consensus of the expert opinion of the members, as reasonably necessary for the protection of the public interest." (pp. 523-524.)

In *Kansas State Board of Healing Arts v. Foote,* 200 Kan. 447, 436 P. 2d 828 (1968), the Court had before it a statute authorizing the revocation of license to practice medicine for "immoral, unprofessional or dishonorable conduct." There the Court said:

"It would indeed be difficult, not to say impractical, in carrying out the purpose of the act, for the legislature to list each and every specific act or course of conduct which might constitute such unprofessional conduct of a disqualifying nature. Nor does any such failure leave the statute subject to attack on grounds of vagueness or indefiniteness. Our statute makes no attempt to delineate what acts are included in the terms immoral or dishonorable conduct, which are also made grounds for revocation. The determination whether by common judgment certain conduct is disqualifying is left to the sound discretion of the board." (pp. 453-454.)

Statutes which authorize revocation for unprofessional conduct, grossly immoral conduct, incompetency, and other general terms have been held valid in the majority of jurisdictions notwithstanding their generality. For discussion and authorities see *Brinkley v. Hassig,* 83 F. 2d 351, 355 (10th Cir. 1936) ; annot., 79 A.L.R. 323, et seq. (1932) ; 61 Am. Jur., Physicians, Surgeons, § 46, pp. 169-170.

The terms used in our statutes have a well-defined meaning both in the law and the dental profession and are entirely sufficient to give respondents notice of the conduct which would warrant suspension or revocation of their licenses. We hold that the applicable phraseology of G.S. 90-41 is not unconstitutionally vague and indefinite.

[4]   Respondents next contend that the proceedings should have been dismissed because the Board lacked jurisdiction over the respondents and the work they performed in the federally financed 1966 summer program out of which the charges arose. This contention is untenable. Respondents rely on the following provision of G.S. 90-29:

> "The following practices, acts, and operations, however, shall be exempt from the provisions of this article:
>
> •   •   •
>
> (3) The practice of dentistry in the discharge of their official duties by dentists in the United States army, the United States navy, the United States public health service, the United States veterans bureau, or other federal agency."

To say the respondents were "in the discharge of their official duties" as employees of a federal agency is simply belying the plain and uncontradicted facts in the record. The record reveals that the respondents were all private practitioners, that they indicated their desire to participate in a program to treat indigent children for their dental needs during the summer of 1966, that the children to be treated had already been screened through the cooperation of the Health Department and dentists employed to do the screening, that the funds for the work were furnished by the Federal Government but the program was administered totally by the Charlotte-Mecklenburg Board of Education through its Director of ESEA activities, that each participating dentist submitted a bill to the Charlotte-Mecklenburg Board of Education for each patient treated, that the services performed were performed by appointment in each dentist's office, where he customarily practiced his profession as a private practitioner. Mr. Burch, the Director of the ESEA program for the Board of Education, testified that after the evaluation of the work had been done, the Board sought advice from the Office of Education in Washington and "[t]hey in turn turned it back to us and said it was a local responsibility in terms of the administration of the program and in terms of the evaluation of the program . . . " At no time were the participating dentists discharging any official duties as dentists for any federal agency. This assignment of error is overruled.

By assignments of error Nos. 3, 4, 10 and 11, respondents bring forward 70 exceptions to the admission or exclusion of evidence. We do not deem it necessary to set out and discuss

these exceptions seriatim, nor do we discuss the question of whether each of these assignments of error presents but a single question for review. *Nye v. Development Co.,* 10 N.C. App. 676, 179 S.E. 2d 795 (1971), cert. denied 278 N.C. 702, 181 S.E. 2d 603 (1971). Suffice it to say that we have examined each of these exceptions and we find no error sufficiently prejudicial to warrant a new trial.

By assignment of error No. 2 respondents contend that error was committed in admitting evidence and making findings with respect to charges brought to the attention of the respondents for the first time. The assignment embraces 15 exceptions. Eight of the exceptions relate to one patient of Dr. Nash. Close examination of the record reveals that the discrepancies included in finding of the Board are substantially the same as the discrepancies listed in the notice to Dr. Nash. This patient was one of 18 patients treated by Dr. Nash with respect to whom both committees and the Board found discrepancies. We have carefully examined all these 15 exceptions, and we find that the findings and the notice are substantially the same, or that the charges with respect to that exception were eliminated from consideration, or that the charges to which the exceptions related were not included in the findings of the Board. This assignment is overruled.

[5] By respondents' remaining assignments of error (Nos. 5, 8 and 13), they contend that the Board and the court erred in failing to dismiss the charges because of the insufficiency of the evidence. Respondents do not contend that the findings of the Board are not supported by competent evidence. This candor is commendable. They do seem to take the position that the Superior Court is to weigh the evidence and make its own independent determination of the matters in dispute as in the case of consent reference. *Board of Dental Examiners v. Grady,* 268 N.C. 541, 151 S.E. 2d 25 (1966). It is true that at the time of the appeal in *Grady,* G.S. 90-41 required the matter on appeal from the Board of Dental Examiners to be heard in the superior court as in the case of consent references. However the 1967 General Assembly amended G.S. 90-41 and that proviso was deleted. The General Assembly of 1967 included the North Carolina State Board of Dental Examiners in G.S. 150-9, and the scope of review of the Board's decisions is covered by G.S. 150-27. This scope of review was discussed by Justice Parker

(later C.J.) in *In re Berman*, 245 N.C. 612, 97 S.E. 2d 232 (1957), where he wrote:

"G.S. 150-27 sets forth the scope of review by the Superior Court of the Board's decision, and states that the Judge shall sit without a jury and may affirm the decision of the agency, or remand the case for further proceedings, or may reverse or modify the decision if substantial rights of a person may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are unsupported by competent, material and substantial evidence in view of the entire record as submitted.

The administrative findings of fact made by the State Board of Opticians, if supported by competent, material and substantial evidence in view of the entire record, are conclusive upon a reviewing court, and not within the scope of its reviewing powers. *Baker v. Varser*, 240 N.C. 260, 82 S.E. 2d 90; 42 Am. Jur., Public Administrative Law, Sec. 211, where great numbers of cases from State and Federal Courts are cited." (pp. 616-617.)

In view of respondents' position, we deem it unnecessary to set out the evidence. Suffice it to say that from our study of this voluminous record we are convinced that every finding of fact entered by the Board was supported by competent, material, and substantial evidence (not disputed by respondents) and that the findings of fact are more than sufficient to support the conclusions of law and judgments thereon.

Both respondents and the Board have been most capably represented at all levels of this proceeding.

Affirmed.

Judges PARKER and VAUGHN concur.