IN THE MATTER OF: BRADFORD P. DAILEY, D.D.S., JUDICIAL REVIEW OF THE DECISION OF THE NORTH CAROLINA STATE BOARD OF DENTAL EXAMINERS v. NORTH CAROLINA STATE BOARD OF DENTAL EXAMINERS

No. 134PA83

(Filed 6 December 1983)

1. **Physicians, Surgeons and Allied Professions § 5— professional licensing board disciplinary hearing — standard of care**

   The Court of Appeals erred in applying the standard of G.S. § 90-21.12, relating to civil liability for medical malpractice, to a professional licensing board disciplinary hearing. The standard of practice by which a dentist's negligence or incompetence is to be measured under the Dental Practice Act is a statewide standard of care. Prior to invoking disciplinary measures as authorized under G.S. 90-41(a), the Board must first be satisfied that the care provided by the licensee was not in accordance with the standards of practice among members of the dentistry profession situated throughout the State of North Carolina at the time of the alleged violation.

2. **Physicians, Surgeons and Allied Professions § 5— remand of dental board decision for consideration of appropriate standard of care — benefit of additional expert testimony necessary**

   The State Board of Dental Examiners was not authorized to enter its final agency decision upon remand without the benefit of additional expert testimony that the care provided by the respondent was not in accordance with the standards of practice among members of the dentistry profession *situated throughout the State* at the time of alleged violations where the previous decision had been rendered in terms of standard of care in the dentist's community.

NORTH Carolina State Board of Dental Examiners appeals from a unanimous decision of the Court of Appeals, 60 N.C. App. 441, 299 S.E. 2d 473 (1983), which reversed in part and affirmed in part a judgment entered by *Brannon, J.*, at the 17 August 1981 Civil Session of Superior Court, WAKE County. Following this Court's denial of the Board's petition for discretionary review on 3 May 1983, we allowed its petition for reconsideration on 7 July 1983. Heard in the Supreme Court on 8 November 1983.

On 15 October 1979 the North Carolina State Board of Dental Examiners, pursuant to G.S. § 90-41.1 and G.S. § 150A-23, issued a notice of hearing to respondent Bradford P. Dailey, D.D.S., to determine whether respondent had violated G.S. § 90-41(a)(12), (13), (14), (19), and (21) which provide that the Board may "[r]evoke or suspend a license to practice dentistry" and "[i]nvoke such

other disciplinary measures, censure, or probative terms against a licensee as it deems fit and proper" if such licensee:

(12) Has been negligent in the practice of dentistry;

(13) Has employed a person not licensed in this State to do or perform any act or service, or has aided, abetted or assisted any such unlicensed person to do or perform any act or service which under this Article or under Article 16 of this Chapter, can lawfully be done or performed only by a dentist or a dental hygienist licensed in this State;

(14) Is incompetent in the practice of dentistry;

(19) Has, in the practice of dentistry, committed an act or acts constituting malpractice;

(21) Has permitted a dental hygienist or a dental assistant in his employ or under his supervision to do or perform any act or acts violative of this Article, or of Article 16 of this Chapter, or of the rules and regulations promulgated by the Board.

The specific factual allegations pertinent to this appeal included, *inter alia*:

I. That at all times relevant to the matters involved in this notice, Dr. Dailey was licensed to practice dentistry in North Carolina;

II. (a) That during the period April through July, 1978, Mayona Morris Baldree was a dental patient under the care of Dr. Dailey;

(b) That during the period stated above, Dr. Dailey extracted Ms. Baldree's lower right third molar (tooth #32) without x-raying the tooth before or after the extraction;

(c) That a large portion of the root tip was left in the extraction site;

(d) That Ms. Baldree returned to Dr. Dailey's office on several occasions after the extraction complaining of pain, and he again failed to x-ray the site or to provide any appropriate treatment.

(e) That an individual engaged in the practice of dentistry in a community similar to that in which Dr. Dailey was conducting his practice would, or should, in the exercise of reasonable care and diligence, have discovered and treated the condition stated above.

(f) That Dr. Dailey failed and neglected to discover or treat such condition or having discovered it, failed to advise of the need for treatment.

(g) That the failures and neglect related in the immediately preceding paragraph constituted negligence in the practice of dentistry, incompetence in the practice of dentistry, and malpractice in the practice of dentistry, all in violation of North Carolina General Statutes 90-41(a)(12), 90-41(a)(14), and 90-41(a)(19).

V. (a) That during the period October, 1977 through May, 1978, Barbara Elaine Lanzer was a dental patient under the care of Dr. Dailey.

(b) That in October, 1977, Dr. Dailey represented to Ms. Lanzer that he had performed a root canal on her lower left first molar (tooth #19).

(c) That Dr. Dailey either did not perform a root canal as he represented or having done so, did so improperly or incompletely and as a result, infection perforated the tooth and it was subsequently lost.

(d) That the procedures performed by Dr. Dailey as outlined above, constituted negligence in the practice of dentistry, incompetence in the practice of dentistry, and malpractice in the practice of dentistry, all in violation of North Carolina General Statutes 90-41(a)(12), 90-41(a)(14), and 90-41(a)(19).

With respect to allegations of negligence in his treatment of two additional patients and to allegations of employing, aiding and abetting or permitting an unlicensed person to practice dentistry in violation of G.S. § 90-41(a)(13) and (21), the Board concluded that Dr. Dailey had committed no violations and those allegations are not before us.

Following a hearing conducted 19 January 1980, the Board made, *inter alia*, the following findings of fact: (We underline certain portions to emphasize the standard employed by the Board.)

3. During the period from April through July, 1978, Mayona Morris Baldree was a dental patient under respondent's care.

4. On June 22, 1978, respondent attempted to extract Ms. Baldree's lower right third molar (tooth No. 32).

5. However, the said molar broke off during the extraction procedure by the respondent and a portion of the root tip, seven millimeters in length, was left by him in the extraction site.

6. Respondent advised Ms. Baldree that a portion of the root remained, and he then immediately attempted to remove it by elevators.

7. Respondent, however, was not able to remove the remaining root tip by means of the elevator procedure.

8. Respondent then sutured the wound and furnished Ms. Baldree written instructions concerning precautions to avoid a dry socket.

9. Respondent did not advise Ms. Baldree that he was not able to remove the remaining root tip.

10. On two occasions thereafter, within the week following the extraction procedure by the respondent, Ms. Baldree returned to his office complaining of pain in the area of the extraction.

11. Nevertheless, respondent did not x-ray the extraction site on either of the two subsequent visits.

12. Respondent, furthermore, did not take steps to remove the root tip in the extraction site but simply attempted to treat the patient, even on the second post-operative visit of the patient, for a dry socket.

13. On July 14, 1978, Ms. Baldree went to another general dentist practicing in New Bern and complained to him of pain on the right side of her face.

14. Ms. Baldree told the second dentist that respondent had extracted tooth No. 32 and that she still experienced pain in that area.

15. However, Ms. Baldree did not tell the second general dentist that a root tip remained in the area of tooth No. 32.

16. The second dentist took a periapical x-ray which indicated the presence of a root tip in the extraction site.

17. Upon seeing the broken root tip, the second dentist immediately referred Ms. Baldree to an oral surgeon practicing in New Bern, North Carolina.

18. The oral surgeon examined the second dentist's x-ray, saw the root tip in place, and with Ms. Baldree's consent, surgically removed the tip.

19. The oral surgeon thereafter took a post-operative x-ray which showed that the root tip had been completely removed.

20. The standard of practice on or about June and July, 1978, among members of the health care profession of general dentistry *with similar training and experience as the respondent and situated in the New Bern, North Carolina community or similar communities* was that a dental patient should be told when a root tip had been left in the patient's mouth after an extraction procedure.

21. The standard of practice on or about June and July, 1978, among members of the health care profession of general dentistry with *similar training and experience as the respondent and situated in the New Bern, North Carolina community or similar communities* was that a x-ray should be taken of a patient when a root tip had been broken off during an extraction to determine if it was feasible to leave that tip in because of the trauma that may be attended to removing it, and that in any event, if an x-ray was not taken at the time the root had been broken, an x-ray should be taken when the patient returns later to the dentist's office complaining of pain.

22. The standard of practice on or about June and July, 1978, among members of the health care profession of general

dentistry *with similar training and experience as the respondent and situated in the New Bern, North Carolina community or similar communities* was that having failed to remove the root tip during an initial extraction procedure and having later determined the presence of a dry socket on the patient's second post-operative visit, steps should be taken by a general dentist on that second post-operative visit for the removal of the root tip himself or by referring the patient to an oral surgeon.

. . . .

25. During the period from October, 1977, through May, 1978, Barbara Elaine Lanzer was a dental patient under respondent's care.

26. On October 5, 1977, respondent represented to Ms. Lanzer that he had performed a root canal on her lower first left molar (tooth No. 19).

27. Respondent charged Ms. Lanzer a fee of $100.00 for performing a root canal on tooth No. 19, which fee is commensurate with a completed root canal procedure.

28. Respondent's written record of treatment of Ms. Lanzer contains the notation dated 10-5-77: "tooth 19 — root canal — filled with cavit," with the words, "filled with cavit" marked out, and the words, "filled — gutta percha" written in the margin in a different hand.

29. The notation, "filled with gutta percha," was written in respondent's hand.

30. However, respondent testified that the root canal on tooth No. 19 was not filled with gutta percha but was, in fact, filled with Sargenti paste, N-2.

31. Sargenti paste is a radiopaque substance which would be visible to x-ray or other forms of radiation.

32. Subsequently, Ms. Lanzer became a patient of another dentist engaged in the general practice of dentistry in New Bern, North Carolina.

33. On September 25, 1978, periapical (around the apex of the root of a tooth) x-rays of Ms. Lanzer's tooth No. 19

were taken which revealed no indication that a conventional root canal had been done on that tooth.

34. Ms. Lanzer's tooth No. 19 subsequently was diagnosed as being abscessed by the second dentist and he thereafter opened it on September 26, 1978, in order to drain it and determine whether the tooth was salvageable.

35. When tooth No. 19 of Ms. Lanzer was opened, the second general dentist discovered that it was perforated (pierced with holes) and was not salvageable.

36. Furthermore, when the tooth No. 19 of Ms. Lanzer was opened on September 26, 1978, no filling material at all was found in the root canal.

37. Neither Sargenti paste nor gutta percha would absorb or resorb into the body within the time in question, approximately twelve months.

38. In fact, no completed root canal filling of any kind was ever placed in the root canal of tooth No. 19 of Ms. Lanzer by the respondent on or about October, 1977.

39. The standard practice on or about October, 1977, among members of the health care profession of general dentistry *with similar training and experience as the respondent and situated in the New Bern, North Carolina community or similar communities* was that when a root canal is performed, the canal is filled with filling material.

Based on these findings, the Board concluded, *inter alia,* that:

1. The standard of practice on or about June and July, 1978, among members of the health care profession of general dentistry *with similar training and experience as the respondent and situated in the New Bern, North Carolina community or similar communities* was that a dental patient should be told when a root tip had been left in the patient's mouth after an extraction procedure.

2. The standard of practice on or about June and July, 1978, among members of the health care profession of general dentistry *with similar training and experience as the respondent and situated in the New Bern, North Carolina com-*

*munity or similar communities* was that an x-ray should be taken of a patient when a root tip had been broken off during an extraction to determine if it was feasible to leave that tip in because of the trauma that may be attended to removing it, and that in any event, if an x-ray should be taken when the patient returns later to the dentist's office complaining of pain.

3. The standard of practice on or about June and July, 1978, among members of the health care profession of general dentistry *with similar training and experience as the respondent and situated in the New Bern, North Carolina community or similar communities* was that having failed to remove the root tip during an initial extraction procedure and having later determined the presence of a dry socket on the patient's second post-operative visit, steps should be taken by a general dentist on the second post-operative visit for the removal of the root tip himself or by referring the patient to an oral surgeon.

4. The acts and omissions on the part of the respondent in his treatment of Mayona Morris Baldree on or about June and July, 1978, do not comply with the standard of practice among members of the health care profession of general dentistry *with similar training and experience as the respondent and situated in New Bern, North Carolina or similar communities,* and such acts and omissions on the part of the respondent constitute negligence and malpractice in the practice of dentistry within the meaning of N.C.G.S. Sec. 90-41(a)(12) and N.C.G.S. Sec. 90-41(a)(19).

. . . .

7. The standard practice on or about October, 1977, among members of the health care profession of general dentistry *with similar training and experience as the respondent and situated in the New Bern, North Carolina community or similar communities* was that when a root canal is performed, the canal of the root is filled with filling material.

8. The acts and omissions on the part of the respondent in his treatment of Barbara Elaine Lanzer on or about October, 1977, do not comply with the standard of practice

among members of the health care profession of general dentistry *with similar training and experience as the respondent and situated in New Bern, North Carolina or similar communities,* and such acts and omissions on the part of the respondent constitute negligence and malpractice in the practice of dentistry within the meaning of N.C.G.S. Sec. 90-41(a)(12) and N.C.G.S. Sec. 90-41(a)(19).

The Board suspended Dr. Dailey's license to practice dentistry for a period of six months "with the final four (4) months of the said suspension itself suspended for three (3) years from the date of respondent's surrendering of his license on the condition that respondent not violate any of the provisions of N.C.G.S. Sec. 90-41(a)" during which time Dr. Dailey was placed on unsupervised probation.

From this Final Agency Decision, respondent appealed. The case was heard before Smith, J., at the 15 December 1980 nonjury civil session of Superior Court, Wake County. Judge Smith found and concluded that "the Board's Findings of Fact 1 through 19, 23 through 38 and 40 and 41, and Conclusions of Law 5, 6, 9 and 10 [were] supported by competent, material and substantial evidence properly admitted in the record." Judge Smith further found and concluded, however, that

while there is substantial evidence in the record to support the Board's findings and conclusions as to the standard of practice among members of the health care profession of general dentistry, the record before the Court does not contain substantial evidence to support the Board's Findings of Fact 20, 21, 22 and 39 and Conclusions of Law 1, 2, 3, 4, 7 and 8 to the extent that those Findings and Conclusions state the standard of practice among dentists *with similar training and experience as the Petitioner and situated in the New Bern, North Carolina community or similar communities.*

Judge Smith therefore ordered

that the Board's Final Agency Decision of July 29, 1980, is hereby AFFIRMED in all respects, except that the portions of the Board's Findings of Fact 20, 21, 22 and 39 and Conclusions of Law 1, 2, 3, 4, 7 and 8 that state the standard of practice among dentists *with similar training and experience*

*as the Petitioner and situated in the New Bern, North Carolina community or similar communities* are hereby REVERSED and the matter is REMANDED to the Board for further Findings of Fact and Conclusions of Law not inconsistent with the JUDGMENT of the Court. (Emphasis in original.)

We are unable to determine from Judge Smith's order whether he recognized that the Board had improperly applied a "same or similar community" standard, or whether he simply remanded the case upon finding insufficient evidence of a "same or similar community" standard. Clearly, the Board interpreted the order to require the application of a statewide standard.

On remand, the Board, without hearing any additional testimony or taking any additional evidence with regard to the statewide standard, amended its Findings of Fact 20 through 22 and 39 and its Conclusions of Law 1 through 4, 7 and 8 and, on 1 April 1981, issued a Final Agency Decision on Remand which stated: (We underline portions to highlight the change in the standard employed.)

20(A). The standard of practice on or about June and July, 1978, *for general dentists licensed to practice in North Carolina* was that a dental patient should be told when a root tip has been left in the patient's mouth after an extraction procedure.

21(A). The standard of practice on or about June and July, 1978, *for general dentists licensed to practice in North Carolina* was that when a root tip has broken off during an extraction an x-ray should be taken to determine the feasibility of leaving the tip in because of trauma that might be attendant to removing it, and that in any event, if an x-ray were not taken at the time the root had been broken, an x-ray should be taken when the patient returns later to the dentist's office complaining of pain.

22(A). The standard of practice on or about June and July, 1978, *for general dentists licensed to practice in North Carolina* was that having failed to remove a root tip remaining after an extraction procedure and having later determined the presence of a dry socket on the patient's second post-operative visit, the general dentist should on the occa-

sion of the second post-operative visit either take steps for the removal of the root tip himself or refer the patient to an oral surgeon.

39(A). The standard of practice on or about October, 1977, *for general dentists licensed to practice in North Carolina* was that when a root canal is performed, the canal is filled with filling material.

Based on the Board's Final Agency Decision as amended herein and the foregoing Further Findings of Fact, the Board hereby makes the following:

FURTHER CONCLUSIONS OF LAW

1(A). Respondent's failure to inform Mayona Morris Baldree that he had left a root tip in her mouth after an extraction procedure did not comply with *the standard of practice among general dentists licensed to practice in North Carolina* and was a dereliction from professional duty resulting in injury, loss, or damage to Ms. Baldree, thereby constituting negligence and malpractice in the practice of dentistry within the meaning of G.S. 90-41(a)(12) and G.S. 90-41(a)(19).

2(A). Respondent's failure to take an x-ray of the extraction site when Ms. Baldree returned to his office complaining of pain in the site, an x-ray not having been taken when a root tip had broken off during an extraction procedure, did not comply with *the standard of practice among general dentists licensed to practice in North Carolina* and was a dereliction from professional duty resulting in injury, loss, or damage to Ms. Baldree, thereby constituting negligence and malpractice in the practice of dentistry within the meaning of G.S. 90-41(a)(12) and G.S. 90-41(a)(19).

3(A). Respondent's failure either to attempt removal of the root tip himself or to refer Ms. Baldree to an oral surgeon on the occasion of her second post-operative visit did not comply with *the standard of practice among general dentists licensed to practice in North Carolina* and was a dereliction from professional duty resulting in injury, loss, or damage to Ms. Baldree, thereby constituting negligence and

malpractice in the practice of dentistry within the meaning of G.S. 90-41(a)(12) and G.S. 90-41(a)(19).

4(A). Having undertaken to perform a root canal procedure on Ms. Lanzer, Respondent's failure to fill the canal with filling material did not comply with *the standard of practice among general dentists licensed to practice in North Carolina* and was a dereliction from professional duty resulting in injury, loss, or damage to Ms. Lanzer, thereby constituting negligence and malpractice in the practice of dentistry within the meaning of G.S. 90-41(a)(12) and G.S. 90-41(a)(19).

The Board reinstated, without alteration, its earlier decision to suspend Dr. Dailey's license to practice dentistry.

Respondent appealed from the Final Agency Decision on Remand, and by Judgment filed 24 August 1981, Judge Brannon affirmed.

The Court of Appeals reversed that portion of the Board's findings and conclusions which were "phrased in terms of a standard of practice observed in 'North Carolina.'" 60 N.C. App. at 443, 299 S.E. 2d at 475. The Court of Appeals determined that G.S. § 90-21.12, relating to civil liability for medical malpractice, provided the appropriate standard of practice to be applied in this case and held that "[i]t is clear from the wording of the statute that the test is not that of a statewide standard of health care, but rather a standard of practice among members of the same health care profession situated in the *same or similar communities.*" *Id.*

The Court of Appeals further reversed finding of fact 39 and conclusions of law 7 and 8, pertaining to Dr. Dailey's treatment of Ms. Lanzer as being unsupported by the evidence.

*Bailey, Dixon, Wooten, McDonald & Fountain, by Ralph McDonald and Carson Carmichael, III, attorneys for appellant, N.C. State Board of Dental Examiners.*

*Sumrell, Sugg & Carmichael, by Fred M. Carmichael and Rudolph A. Ashton, III, attorneys for appellee, Bradford P. Dailey, D.D.S.*

MEYER, Justice.

[1]  The primary issue on this appeal is whether the Court of Appeals erred in applying the standard of G.S. § 90-21.12, relating to civil liability for medical malpractice, to a professional licensing board disciplinary hearing. We hold that it did.

This appeal is from an administrative hearing held pursuant to the Dental Practice Act, N.C.G.S. Chapter 90, Article 2, and the Administrative Procedure Act, N.C.G.S. Chapter 150A, Article 3, to determine whether respondent should be disciplined for alleged violations of the Dental Practice Act. G.S. § 90-21.12, on the other hand, provides that:

> § 90-21.12. Standard of health care.
>
> In any action for damages for personal injury or death arising out of the furnishing or the failure to furnish professional services in the performance of medical, dental, or other health care, the defendant shall not be liable for the payment of damages unless the trier of the facts is satisfied by the greater weight of the evidence that the care of such health care provider was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the alleged act giving rise to the cause of action.

G.S. § 90-21.12 thus establishes a standard of care below which a health care provider may be held *civilly liable in damages*. Clearly, G.S. § 90-41 and G.S. § 90-21.12 serve different purposes. Admittedly the violations for which a dentist may be subject to discipline include acts of "malpractice," G.S. § 90-41(a)(19). We do not believe, however, that this language was intended to incorporate a standard applicable in actions for damages "for personal injury or death arising out of the furnishing or the failure to furnish professional services in the performance of . . . dental . . . care." G.S. § 90-21.12. In fact, G.S. § 90-41 was first enacted in 1935, long before the 1975 enactment of G.S. § 90-21.12. Therefore, the standard of health care enunciated under G.S. § 90-21.12 is inapplicable.

The Dental Practice Act is silent as to the standard of practice by which a dentist's negligence or incompetence is to be

measured. In considering the regulatory, licensing and disciplinary functions of the North Carolina State Board of Dental Examiners, we hold that a statewide standard must be applied. That is, prior to invoking disciplinary measures as authorized under G.S. § 90-41(a), the Board must first be satisfied that the care provided by the licensee was not in accordance with the standards of practice among members of the dentistry profession situated throughout the State of North Carolina at the time of the alleged violation.

The North Carolina State Board of Dental Examiners, like all other professional licensing boards, was created to establish and enforce a uniform statewide minimum level of competency among its licensees. Applicants are required to meet a minimum statewide standard prior to being granted a license, G.S. § 90-30; and licensees are required, irrespective of location in the State, to comply with the rules and regulations promulgated by the Board. Likewise we believe that the decision of whether an applicant or licensee has violated *any* of the factors enumerated in G.S. § 90-41 authorizing disciplinary action must also be viewed in the context of a uniform statewide standard.[1] In this respect Judge Smith was correct in remanding the case for findings and conclusions based on a statewide standard of practice.

[2] We do not agree with the Board, however, that it was authorized to enter its Final Agency Decision Upon Remand without the benefit of additional expert testimony that the care provided by the respondent was not in accordance with the standards of practice among members of the dentistry profession *situated throughout the State* at the time of the alleged violations.

The Board argues that because it is an administrative agency "composed of experts," it may make its own judgment of the evidence and reject even uncontradicted expert testimony. *Util-*

---

1. We note that language similar to that in G.S. § 90-41(a)(12), (14) and (19) appears in numerous other health profession licensing statutes: *see* G.S. § 90-14(a)(11) (Supp. 1983) (Practice of Medicine); G.S. § 90-121.2(a)(12), (14) and (19) (Supp. 1983) (Optometry); G.S. § 90-136(3) (Osteopathy); G.S. § 90-154(5), (6) (Supp. 1983) (Chiropractic Medicine); G.S. § 90-171.37(5) (Supp. 1983) (Nursing Practice); G.S. § 90-202.8(a)(12), (13) (Supp. 1983) (Podiatrists); G.S. § 90-229(a)(5), (10) (Dental Hygiene); G.S. § 90-270.36(7) (Physical Therapy); G.S. § 90-270.60(a)(4) (Marital and Family Therapy).

*ities Commission v. Duke Power Co.*, 305 N.C. 1, 287 S.E. 2d 786 (1982). Thus, reasons the Board, as a professional licensing body it is authorized to substitute its own expertise for that of expert witnesses, and is therefore authorized to make an independent determination of the standards of practice required for continued licensure without the benefit of expert testimony.

We first point out that *Utilities Commission v. Duke Power Co.*, 305 N.C. 1, 287 S.E. 2d 786, was a utility rate case. G.S. § 150A, the Administrative Procedure Act, specifically exempts the Utilities Commission from its coverage. G.S. § 150A-1. The cornerstone of the Administrative Procedure Act is a requirement that there be preserved a record for judicial review. Implicit in this requirement is the necessity for reasoned evaluation and analysis of evidence presented before the agency upon which its determination must be based. As stated in *Arthurs v. Board of Registration*, 383 Mass. 299, ---, 418 N.E. 2d 1236, 1244 (1981),

> 'This startling theory [that the Board could use its own expertise without the evidentiary basis of that expertise appearing in the record], if recognized, would not only render absolute a finding opposed to uncontradicted testimony but would render the right of appeal completely inefficacious as well. A board of experts, sitting in a quasi-judicial capacity, cannot be silent witnesses as well as judges.' The board may put its expertise to use in evaluating the complexities of technical evidence. However, the board may not use its expertise as a substitute for evidence in the record.

(Citations omitted.) *Accord, Wood v. Texas State Bd. of Medical Examiners*, 615 S.W. 2d 942 (Tex. 1981); *Dotson v. Tex. State Bd. of Medical Exam.*, 612 S.W. 2d 921 (Tex. 1981); *Franz v. Board of Medical Quality Assur.*, 31 Cal. 3d 124, 181 Cal. Rptr. 732, 642 P. 2d 792 (1982); *Farney v. Anderson*, 14 Ill. Dec. 346, 56 Ill. App. 3d 677, 372 N.E. 2d 151 (1978).

Thus, while it is true that " '[t]he determination whether by common judgment certain conduct is disqualifying is left to the sound discretion of the board,' " *In re Hawkins*, 17 N.C. App. 378, 395, 194 S.E. 2d 540, 551, *cert. denied*, 283 N.C. 393, 196 S.E. 2d 275, *cert. denied*, 414 U.S. 1001 (1973), the record must include an indication of the basis upon which the board or other agency exercised its expert discretion. On this issue, the following observa-

tion by the Supreme Court of the United States is applicable and bears repeating.

> We are not prepared to and the Administrative Procedure Act will not permit us to accept such adjudicatory practice [no findings and no analysis to justify the choice made, no indication of the basis on which the Commission exercised its expert discretion]. Expert discretion is the lifeblood of the administrative process, but 'unless we make the requirements for administrative action strict and demanding, *expertise*, the strength of modern government, can become a monster which rules with no practical limits on its discretion.' 'Congress did not purport to transfer its legislative power to the unbounded discretion of the regulatory body.'

*Burlington Truck Lines v. United States*, 371 U.S. 156, 167, 9 L.Ed. 2d 207, 215 (1962) (citations omitted).

Having reviewed the testimony of record, we agree with Judge Smith and find substantial, competent evidence to support those findings of fact and conclusions of law as set out and affirmed in Judge Smith's Judgment of 20 February 1981. We reverse the decision of the Court of Appeals and remand the case to that court for further remand to the North Carolina State Board of Dental Examiners for the purpose of taking additional testimony respecting the statewide standard of practice and whether the care provided by the respondent was in accordance with that standard.

Reversed and remanded.