IN THE MATTER OF THE SUSPENSION OR REVOCATION OF THE CERTIFICATE OF FRED F. HELLER, R. P. TO PRACTICE PHARMACY IN THE STATE OF NEW JERSEY; AND OF THE PERMIT OF CARFRED, INC.; T/A HELLER PHARMACY TO CONDUCT A PHARMACY IN THE STATE OF NEW JERSEY.

Argued October 13, 1976—Decided January 20, 1977.

*Mr. Martin L. Greenberg* argued the cause for appellants Heller and Carfred, Inc. (*Messrs. Greenberg and Margolis,* attorneys; *Mr. Greenberg* of counsel; *Mr. Stephen N. Dratch* on the brief).

*Mr. John Paul Dizzia,* Deputy Attorney General, argued the cause on behalf of respondent Board of Pharmacy (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney; *Mr. Stephen Skillman,* Assistant Attorney General, of counsel; *Mr. Dizzia* on the brief).

The opinion of the court was delivered by

HUGHES, C. J. This appeal concerns a decision and order of the New Jersey State Board of Pharmacy (*N. J. S. A.* 45:14-1 *et seq.*) revoking the certificate of a registered pharmacist, Fred F. Heller, R. P., revoking the permit to conduct a pharmacy of Carfred, Inc., trading as Heller Pharmacy, and assessing a "civil penalty" of $50,472 jointly against both. Fred F. Heller is President of Carfred, a closely-held corporation, and was pharmacist-in-charge of Heller Pharmacy.

An appeal was taken to the Appellate Division, *R.* 2: 2-3(2), which affirmed both revocations and penalty assessment. 150 *N. J. Super.* 25 (1975). Although the judges were unanimous as to the validity of the revocations, Judge Crane dissented as to that of the penalty assessment. We granted certification, 69 *N. J.* 383 (1976), in order to deal with both issues.

The Board of Pharmacy had issued a complaint charging that appellants, during a period between May 1973 and October 1974, sold improperly more than 18,000 four-

ounce bottles of codeine-based cough syrup. This material was classified as a "controlled dangerous substance" under Schedule V of *N. J. A. C.* 8:65–10.1, promulgated pursuant to *N. J. S. A.* 24:21–3. It was permitted to be legally dispensed without prescription under standards set forth in *N. J. A. C.* 8:65–7.19, including recordation of such sales in a bound record book (an "Exempt Narcotics" book). The complaint charged that this volume of sales was "in gross excess" of the legitimate medical needs of the purchasers; that appellants failed to exercise proper professional judgment in making these sales, and that they sold the substances at unconscionable prices. It charged that such activities were not in good faith, were without medical justification or recognized and legitimate cause, and constituted grossly unprofessional conduct in violation of *N. J. S. A.* 45:14–12.

In a separate count the Board charged that the sale of these substances for a unit price of $8 per four-ounce bottle constituted a retail "mark-up" of 400 percent or five times the wholesale cost of a four-ounce bottle of such substances; and that the sale of the substances at such price was unconscionable and constituted grossly unprofessional conduct in violation of the statute. The complaint sought by way of remedy the suspension or revocation of appellants' licenses to practice pharmacy and to operate a drug store. Both the complaint and the notice of hearing thereunder were silent, however, as to any claim for the assessment of civil penalties.

The Board, after hearing extensive testimony, determined that appellants were guilty of grossly unprofessional conduct and practices. It concluded that during the interval mentioned the appellants had realized ("grossed") $100,944, "half of which or $50,472 is the minimum amount of unjust profit" gained from "unprofessional practices and pricing."

The Board adjudged appellants guilty of all charges and entered an order revoking the permit of Heller Pharmacy

to conduct a pharmacy and the certificate of Heller to practice pharmacy. It further ordered:

That Heller Pharmacy and Fred Heller R. P., are herewith and hereby assessed a civil penalty in the amount of $50,472, which amount is equal to the minimum amount of unjust profit derived by Fred Heller, R. P., by means of grossly unprofessional conduct.

The following evidence taken at the administrative hearing (at which Heller did not testify but offered three "character" witnesses) was relied upon by the Board in its ultimate decision that Heller was guilty of "grossly unprofessional conduct."

Heller Pharmacy is a relatively low-volume drug store, reporting only 10,582 prescription sales in 1973 and 9,536 in 1974. Located in a declining urban neighborhood in Newark, it experienced a 5,000 item drop in prescription sales from 1971 to 1974. In October 1974 a New Jersey Department of Health field representative conducted an accountability audit of Heller's sales of Schedule V cough preparations. The audit revealed that Heller had sold 18,766 four-ounce bottles of these cough preparations between May 1, 1973, and October 16, 1974. Heller had scrupulously maintained his "Exempt Narcotics" record and had observed the other formalities relevant to Schedule V sales. He insisted on making all the sales personally, as well as meticulously recording them. He would not sell to a given customer more frequently than once every 48 hours.

The purchasers were primarily not regular prescription customers; a third of them lived outside the city; half of the purchasers bought these drugs on a regular basis, some buying a bottle every third day. They bought the cough syrup from Heller "because it was hard to get and not many other people sold it." A former employee who had observed Heller making thousands of sales testified that Heller had indicated to him that people could get "high" (a slang term for drug intoxication) on the medication, although the witness quibbled as to Heller's use of that

precise word. Heller rarely inquired about the purchaser's health. He sold an equal volume of the medication in summer and winter months.

Several established pharmacists testified that they were much more guarded in such sales and made substantially fewer of them. They also testified that significantly more such medications were called for and dispensed in the winter months. As compared to Heller's unit price of as high as $8, the other pharmacists sold at a range of $1.69 to $3. The wholesale cost to the pharmacy ranged from $1.20 to $1.75 per bottle.

On this factual base the Board determined that Heller had pandered to those intending an illicit and non-medical use[1] of the medications, had realized unconscionable profits therefrom, and consequently had been guilty of grossly unprofessional conduct and was justly subjected to the sanctions imposed.

The appeal projects two basic issues: (1) Was the revocation of appellants' professional licenses for "grossly unprofessional conduct" valid? (2) Was the imposition of a civil penalty in the amount of $50,472 a valid exercise of the Board's remedial powers in these circumstances?

Appellants contend that they violated no specific statute or Board regulation concerning the manner in which non-prescription Schedule V drugs may be sold. Because their conduct is neither expressly proscribed by the Pharmacy Act, nor included in the particularized definitions of "grossly unprofessional conduct" under *N. J. S. A.* 45:14–12(a)–(f), they question the authority of the Board to revoke their licenses. Innocence of intent to commit a wrongful act is apparent, say appellants, because Heller kept such a complete record of the sales of these substances.

---

[1] *N. J. S. A.* 24:21–15(c) provides that:

No controlled dangerous substance included in Schedule V may be distributed or dispensed other than for a valid and accepted medical purpose.

The last quoted statute empowers the Board to withhold, suspend or revoke a pharmacist's license for specific acts or conditions, including conviction of violating certain laws, chronic inebriety, drug addiction, adulteration of drugs, and incompetency. In addition the law provides that the Board may

suspend or revoke the certificate of a registered pharmacist * * * upon proof satisfactory to the board that such registered pharmacist * * * is guilty of grossly unprofessional conduct and the following acts are hereby declared to constitute grossly unprofessional conduct for the purpose of this act. [*N. J. S. A.* 45:14–12].

There follows a list of six types of activity which include (a) paying rebates to any person for recommending the services of another person; (b) providing physicians with prescription blanks bearing the pharmacist's name; (c) advertising the sale of prescription drugs and narcotics at discount rates; (d) claiming professional superiority in the compounding or filling of prescriptions; (e) fostering the interests of one group of patients at the expense of another, and (f) distributing premiums or rebates in connection with the sale of drugs and medications.

The appellants assert that the Legislature intended this list to be exclusive and that since their conduct did not specifically fall within any of these categories, it may not be deemed "grossly unprofessional conduct" for purposes of a revocation proceeding. In that argument they rely heavily upon the decision of the Pennsylvania Supreme Court in *Pennsylvania State Bd. of Pharmacy v. Cohen,* 448 *Pa.* 189, 292 *A.* 2d 277 (1972), dealing with a similar statute. In that case the State Board of Pharmacy had suspended a pharmacist's license after finding him guilty of "grossly unprofessional conduct." He was found to have sold quantities of items used in connection with drug abuse. On appeal the Supreme Court reversed, holding that because the pharmacist's conduct did not violate any of the 13 specific prohibitions delineated as constituting

grossly unprofessional conduct the State Board had exceeded its authority by suspending the license. 292 *A.* 2d at 280.

The rationale of the Pennsylvania decision was that the statutory scheme evinced a "legislative intention to provide clear advance notice of the enumerated grounds for imposition of sanctions by the Board" and that a contrary conclusion would render the entire statute constitutionally suspect on grounds of vagueness and failure to provide adequate notice and a clear description of the proscribed conduct. That court believed that the regulatory function of defining prohibited conduct may not be accomplished on an *ad hoc* basis but may only be achieved through formal rule-making procedures.

Other jurisdictions have taken a position contrary to the *Cohen* court. *In Kansas State Bd. of Healing Arts v. Foote,* 200 *Kan.* 447, 436 *P.* 2d 828 (Sup. Ct. 1968), for example, a State Board had revoked a physician's license by reason of his "extreme incompetence" despite the fact that extreme incompetence was not one of 15 specific acts constituting "unprofessional conduct" under the governing statute. In affirming the decision of the Board, the Supreme Court rejected the suggestion that the Board had unlawfully created an additional ground of revocation:

The objective always in statutory construction is to ascertain and give effect to legislative intent. In so doing, where police power is to be exercised, we must fairly read the entire context of legislation on the subject, rather than only an isolated section, and consider the object of that legislation and the evils or mischief sought to be prevented or remedied. * * *

The whole purpose and tenor of the healing arts act is the protection of the public against unprofessional, improper, unauthorized and unqualified practice of the healing arts. The goal is to secure to the people the services of competent, trustworthy practitioners. The act seeks to do this through licensure. * * * Considering the entire policy expressed in the act, *we believe the legislature, by enumerating certain acts and classifying them as unprofessional conduct, did not thereby intend to exclude all other acts or conduct in the practice of the healing arts which by common understanding render the holder of a license unfit to practice.* It would indeed be

difficult, not to say impractical, in carrying out the purpose of the act, for the legislature to list each and every specific act or course of conduct which might constitute such unprofessional conduct of a disqualifying nature. [436 *P.* 2d at 833 (emphasis added)].

In *State ex rel. Lentine v. State Bd. of Health,* 334 *Mo.* 220, 65 *S. W.* 2d 943 (Sup. Ct. 1933), a doctor's license was revoked for his having participated in a scheme to sell medical licenses. Relying upon a Missouri statute similar to ours, the State Board of Health deemed this activity "unprofessional and dishonorable conduct" although the sale of medical licenses was not among the specifically enumerated acts of unprofessional conduct listed in the statute. 65 *S. W.* 2d at 945.

The Supreme Court of Missouri upheld the Board, noting that by particularizing certain acts the legislature did not intend

to thereby exclude all other acts or conduct affecting the practice of medicine and the moral conduct of the physician, in that connection, which by common opinion and fair judgment are found to be in their very nature unprofessional and dishonorable, as grounds or cause for revocation of a license. Rather upon a showing of any of the things enumerated the board of health, and the court upon review, is not called upon in its sound discretion to determine whether such conduct is such as in common judgment is deemed unprofessional and dishonorable, for the statute has expressly declared it so to be. It would not be practicable to the carrying out of the wholesome purpose of the statute to undertake to catalogue, list, or specify each and every act or course of conduct which would, or under what circumstances, constitute bad moral character or unprofessional and dishonorable conduct, and we do not think the Legislature intended to do so. [65 *S. W.* 2d at 950].

*See also Bell v. Board of Regents,* 295 *N. Y.* 101, 65 *N. E.* 2d 184, 187 (Ct. App. 1946) ("It has never been necessary for the Legislature * * * to define with particularity acts which would constitute unprofessional conduct") ; *State ex rel. Conway v. Hiller,* 266 *Mo.* 242, 180 *S. W.* 538, 544 (Sup. Ct. 1915).

The *Lentine* court went on to state that the statutory terms "bad moral character" and "unprofessional and dis-

honorable conduct" were not so vague as to render the statute unconstitutional. 65 *S. W.* 2d at 949. *Cf. Morra v. State Bd. of Examiners of Psychologists,* 212 *Kan.* 103, 510 *P.* 2d 614, 621–22 (Sup. Ct. 1973); *Kansas State Bd. of Healing Arts v. Foote, supra,* 436 *P.* 2d at 833; *In re Hawkins,* 17 *N. C. App.* 378, 194 *S. E.* 2d 540, 550–51 (Ct. App.), *cert.* den., 283 *N. C.* 393, 196 *S. E.* 2d 275 (Sup. Ct.), *cert.* den., 414 *U. S.* 1001, 94 *S. Ct.* 355, 38 *L. Ed.* 2d 237 (1973); *Vivian v. Examining Bd. of Architects,* 61 *Wis.* 2d 627, 213 *N. W.* 2d 359, 366–67 (Sup. Ct. 1974).

While there are no New Jersey cases dealing with this issue under *N. J. S. A.* 45:14–12, our case law in other areas seems to adopt the approach taken by the group of cases contrary to *Cohen.*

In *In re Comm'r of Banking & Insurance v. Parkwood Co.,* 98 *N. J. Super.* 263 (App. Div. 1967), it was held that the Commissioner of Banking and Insurance, having found that an insurance broker wrongfully withheld an insurance premium, could suspend the broker's license on the general grounds of "incompetency" and "unworthiness." The court there noted the need for a liberal construction of the Commissioner's powers:

An insurance broker acts in a fiduciary capacity and is held to a high standard of conduct. Close and continuous scrutiny of the licensee's exercise of his license and the establishment of standards and guidelines are necessary to maintain the high standard of conduct and the degree of fidelity the statute envisions. As a means of accomplishing this objective, the Legislature has conferred on the Commissioner authority to suspend or revoke the license of a licensee if he has demonstrated unworthiness, bad faith, incompetency or dishonesty. [98 *N. J. Super.* at 268].

In *Goodley v. New Jersey Real Estate Comm'n,* 29 *N. J. Super.* 178, 181–82 (App. Div. 1954), the court recognized the appropriateness of "unworthiness" as a general standard for measuring the conduct of real estate brokers, and in *Berardi v. Rutter,* 42 *N. J. Super.* 39, 45–47 (App. Div. 1956), aff'd sub nom., *In re Berardi,* 23

*N. J.* 485 (1957), the court upheld the power of the Superintendent of State Police to revoke the license of a private detective if there is sufficient evidence to show that the licensee lacked "good character, competency and integrity." *Cf. Burton v. Sills,* 53 *N. J.* 86, 90–92 (1968), appeal dismissed, 394 *U. S.* 812, 89 *S. Ct.* 1486, 22 *L. Ed.* 2d 748 (1969); *Schierstead v. City of Brigantine,* 20 *N. J.* 164, 169 (1955); *Township of Cherry Hill v. New Jersey Racing Comm'n,* 131 *N. J. Super.* 125, 137–39 (Law Div.), aff'd o. b., 131 *N. J. Super.* 482 (App. Div. 1974), certif. den., 68 *N. J.* 135 (1975).

It is thus apparent that with respect to certain professions, our courts have permitted regulatory agencies to take action based upon general statutes, without necessarily limiting their powers to the express provisions of a particular enabling statute. In the seminal case of *Ward v. Scott,* 11 *N. J.* 117 (1952), Justice Jacobs stated for this Court:

In dealing with the question of standards it is elementary that we are not confined to the specific terms of [the statute] but must examine the entire act in the light of its surroundings and objectives. See *Carlson v. Landon,* 342 *U. S.* 524, 72 *S. Ct.* 525, 96 *L. Ed.* 547 (1952). Nor are we restricted to the ascertainment of standards in express terms if they may be reasonably implied from the entire act. See *Brandon v. Montclair,* 124 *N. J. L.* 135, 143, 11 *A.* 2d 304, 309 (*Sup. Ct.* 1940), affirmed 125 *N. J. L.* 367, 15 *A.* 2d 598 (*E. & A.* 1940), where Justice Heher rightly noted that "A statute often speaks as plainly by inference, and by means of the purpose which underlies it, as in any other manner. That which is clearly implied is as much a part of the law as that which is expressed." [11 *N. J.* at 123].

*See also Avant v. Clifford,* 67 *N. J.* 496, 549–54 (1975); *Schierstead v. City of Brigantine, supra,* 20 *N. J.* at 169; *In re Tenure Hearing of Grossman,* 127 *N. J. Super.* 13, 28–29 (App. Div. 1974). *But see State Bd. of Medical Examiners v. Weiner,* 68 *N. J. Super.* 468, 479–83 (App. Div. 1961).

This conclusion is, to a large extent, a consequence of the exigencies and practicalities of the modern regulatory process. As stated in *Ward v. Scott, supra*:

It is settled that the Legislature may not vest unbridled or arbitrary power in the administrative agency but must furnish a reasonably adequate standard to guide it. * * * But the exigencies of modern government have increasingly dictated the use of general rather than minutely detailed standards in regulatory enactments under the police power. Thus, the Board of Public Utility Commissioners has been guided by simple standards of "public convenience and necessity" * * * and "just and reasonable." * * * The Commissioner of Alcoholic Beverage Control, with authority to fix prices and promulgate regulations * * * has been guided by the general legislative pronouncement that the statute shall be administered in "such a manner as to promote temperance and eliminate the racketeer and bootlegger." * * * And the Director of the Milk Control Board has been authorized to take such measures including the fixing of prices and the promulgation of regulations as may be "necessary to control or prevent unfair, unjust, destructive or demoralizing practices" * * *. [11 *N. J.* at 123–24 (citations omitted)].

*See also Jansco v. Waldron,* 70 *N. J.* 320, 326–27 (1976); *Wagner v. Mayor, etc., Newark,* 42 *N. J. Super.* 193, 213 (Law Div. 1956), rev'd on other grounds, 24 *N. J.* 467 (1957).

For this reason, courts have consistently held that

the powers of an administrative agency should be liberally construed to permit the agency to achieve the task assigned to it, and that such administrative agency has such implied incidental powers as may reasonably be adapted to that end. [*In re Comm'r of Banking & Insurance v. Parkwood Co., supra,* 98 *N. J. Super.* at 271–72].

*Cf. New Jersey State AFL-CIO v. Bryant,* 55 *N. J.* 171, 176 (1969); *Shelton College v. State Bd. of Educ.,* 48 *N. J.* 501, 524 (1967); *Allendale Field & Stream Ass'n v. Legalized Games of Chance Control Comm'n,* 41 *N. J.* 209, 217 (1963); *Bechler v. Parsekian,* 36 *N. J.* 242, 249–51 (1961); *Cammarata v. Essex Cty. Park Comm'n,* 26 *N. J.* 404, 411 (1958).

Where, as here, the task of the regulatory agency is "to protect the health and welfare of members of the public"

by assuring that all licensed practitioners are qualified, competent and honest, the grant of implied powers is particularly important. *Rite Aid of N. J., Inc. v. Board of Pharmacy,* 124 *N. J. Super.* 62, 66–68 (App. Div.), certif. den., 63 *N. J.* 503 (1973); *cf. Abelson's, Inc. v. New Jersey State Bd. of Optometrists,* 5 *N. J.* 412, 418–21 (1950); *Kansas State Bd. of Healing Arts v. Foote, supra,* 436 *P.* 2d at 833. The Board argues that to adequately fulfill its assigned task, it must be allowed to suspend or revoke a pharmacist's license, where the continuation of his practice poses a threat to the public health and especially where, as here, his conduct appears to be considerably more egregious than conduct specifically proscribed by *N. J. S. A.* 45:14–12(a)–(f).

Corollary to appellants' challenge to the Board's adjudication of "unprofessional conduct" *sans* statute or regulation classifying the specific acts as such, is the argument that the Board could not in any event "add" to the statute, even by adopting such a regulation. Our cases, *Rite Aid, supra,* and others, have rejected such narrow interpretation as discordant with the legislative intent in its delegation of power. We reach the same determination in this case.

As to the need for promulgation of regulations prior to imposing sanctions, the Board cites these passages from *Securities and Exchange Comm'n v. Chenery Corp.,* 332 *U. S.* 194, 201–02, 67 *S. Ct.* 1575, 1580, 91 *L. Ed.* 1995, 2002 (1947):

> It is true that our prior decision explictly recognized the possibility that the Commission might have promulgated a general rule dealing with this problem under its statutory rule-making powers, in which case the issue for our consideration would have been entirely different from that which did confront us. 318 U. S. at pages 92, 93, 63 *S. Ct.* 454, at pages 461, 462, 87 *L. Ed.* 626, [635, 636]. But we did not mean to imply thereby that the failure of the Commission to anticipate this problem and to promulgate a general rule withdrew all power from that agency to perform its statutory duty in this case. To hold that the Commission had no alternative in this proceeding but to approve the proposed transaction, while formulating any general rules it might desire for use in future cases of this

nature, would be to stultify the administrative process. That we refuse to do.

\* \* \*

\* \* \* The function of filling in the interstices of the Act should be performed, as much as possible, through this quasi-legislative promulgation of rules to be applied in the future. But any rigid requirement to that effect would make the administrative process inflexible and incapable of dealing with many of the specialized problems which arise. \* \* \* Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule. Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations. In performing its important functions in these respects, therefore, an administrative agency must be equipped to act either by general rule or by individual order. To insist upon one form of action to the exclusion of the other is to exalt form over necessity. [Citation omitted].

There is substantial authority in New Jersey supporting these general principles. For instance, in a line of cases construing the power of a municipality to discipline its police officers, our courts have consistently held that "a finding of misconduct against a police officer need not be predicated upon the violation of any particular regulation or rule." *Jansco v. Waldron, supra,* 70 *N. J.* at 328. *See City of Asbury Park v. Department of Civil Serv.,* 17 *N. J.* 419, 429–30 (1955); *Sabia v. City of Elizabeth,* 132 *N. J. Super.* 6, 11 (App. Div. 1975); *In re Emmons,* 63 *N. J. Super.* 136, 140 (App. Div. 1960). For comparable holdings in other areas see *Data Access Systems, Inc. v. State,* 117 *N. J. Super.* 95, 101–02 (App. Div. 1971), rev'd on other grounds, 63 *N. J.* 158 (1973); *R. H. Macy & Co. v. Director, Div. of Taxation,* 77 *N. J. Super.* 155, 180 (App. Div. 1962), aff'd o. b., 41 *N. J.* 3 (1963); *Mitchell v. Cavicchia,* 29 *N. J. Super.* 11, 14–15 (App. Div. 1953). Nevertheless, the issue is not always as clear cut as we find it to be in the instant case, and the decision as to whether an agency's adjudicatory ruling is proper will vary from case to case and depend upon all the relevant circumstances. *See, e. g., Boller Beverages, Inc. v. Davis,* 38 *N. J.* 138, 151–54 (1962).

The fabric of the Heller argument rests upon the *Cohen* thesis, namely that no species of unprofessional conduct was intended by the Legislature to be punishable under the statute unless specifically proscribed on its face or delineated by regulation. Here it is instructive to consider the nature of the specific descriptions of unprofessional conduct in the statute. They deal with matters requiring special identification, being of a nature *malum prohibitum* rather than *malum in se*. These include, for instance, the ban on advertising at discount rates, a frequent and legal commercial practice in many other fields; claiming professional superiority in the compounding or filling of prescriptions, not unlike effusive claims of product excellence in advertising medicinal drugs in the television marketplace; or the offering of premiums or rebates, as practiced almost universally in the commercial supermarket world. This need for special identification does not exist in respect to conduct inherently wrong and obviously "unprofessional." Assume, in the case of the pharmacist licensed to practice his profession (presumably honorably) that such a pharmacist made a practice of demanding, before dispensing a sensitive narcotic (even one dispensable, as in Section V substances, without prescription), that an "under the counter" dollar be paid in addition to the actual cost of the substance. (This seems not far from what Heller did by way of exorbitant pricing.) Or a pharmacist so bigoted as to refuse lawfully prescribed medicines to members of a given race or religion. Or assume a pharmacist so forgetful or careless as to repeatedly mis-prepare dangerous medicinal drugs not called for, or in different proportions than called for, in the prescriptions. None of these misdeeds or aberrations are tabulated as acts of professional misconduct in the pharmacy statute or regulations, but that fact does not make them less so. And it is inconceivable to us that the Legislature intended the absurd result of immunizing such conduct from treatment by the Board as "grossly unprofessional conduct."

Heller can hardly claim that the statutory language led him to believe that his conduct was permissible. The *malum in se* nature of his activity belies this contention as does the entire statutory pattern which was clearly intended to insure that persons authorized to dispense dangerous drugs do so in a manner which is above reproach.

Furthermore, *N. J. S. A.* 24:21–15(c) specifically prohibits the dispensing of Schedule V drugs "other than for a valid and accepted medical purpose." It is beyond contention that Heller was aware that the drugs he was selling were not being consumed for valid medical purposes.

We are clear, therefore, that we should not follow the Pennsylvania *Cohen* rule, but hold to the contrary, in harmony with the many precedents above cited. We determine that the Heller activities were classifiable as "grossly unprofessional conduct."

█ A separate contention was made (on which, on appellants' motion, supplemental briefs were filed) as to the significance of legislation adopted after Heller's activities had ended. On March 3, 1976, the Legislature enacted as an additional ground for revoking a pharmacist's license (as well as those of other health care professionals) the dispensing of a controlled dangerous substance

in an indiscriminate manner, or not in good faith, or without good cause, or where the licensee reasonably knows or should have known that the substance or substances prescribed are to be used for unauthorized or illicit consumption * * *. [*N. J. S. A.* 45:1–13 (*L.* 1975, *c.* 382, § 1)].

The argument is made that such "sharpening" of the statute demonstrates that the Legislature had not previously intended to proscribe the conduct involved here. The Board answers that for nearly 20 years the term "grossly unprofessional conduct" has been interpreted to include practices other than those enumerated previously in *N. J. S. A.* 45:14–12 and that the recent amendment simply clarified this prior law.

It is often held that a change of language in a statute "ordinarily implies a purposeful alteration in the substance of the law." *William H. Goldberg & Co. v. Division of Employment Sec.,* 21 *N. J.* 107, 112–13 (1956). On the other hand, it is equally plausible, in a given instance, that the Legislature intended merely to clarify already existing law. *Cf. Jersey City Chapt. of Prop. Owner's Protective Ass'n v. City Council,* 55 *N. J.* 86, 95 (1969) ; *J. R. Christ Constr. Co. v. Willete Assocs.,* 47 *N. J.* 473, 480 (1966). Professor Sutherland states that:

> If the amendment was enacted soon after controversies arose as to the interpretation of the original act, it is logical to regard the amendment as a legislative interpretation of the original act — a formal change — rebutting the presumption of substantial change. [1A *Sutherland, Statutory Construction* § 22.31, at 184 (C. Sands 4th ed. 1972) (footnote omitted)].

We find that the amendment language amounted to no more than a clarification of the statute as it existed during Heller's alleged misconduct. To hold otherwise would be to suppose that the Legislature was previously unconcerned with the dispensing of controlled dangerous substances included in Schedule V for other than valid and accepted medical purposes, a proposition surely untenable in view of *N. J. S. A.* 24:21–15(c), which was adopted in 1970.

■ A minor point is the appellants' contention that the three pharmacists who testified before the Board were not qualified as experts to establish a standard of professional conduct. These pharmacists had 20, 24 and 49 years of experience respectively; no objection was made to their qualifications at the hearing; and the Board itself is comprised of five registered pharmacists whose presumed expertise is accorded great weight by an appellate court. *Supermarkets Gen. Corp. v. Sills,* 93 *N. J. Super.* 326, 350 (Ch. Div. 1966) ; *see In re Comm'r of Banking & Insurance v. Parkwood Co., supra,* 98 *N. J. Super.* at 271. The instant case is a proceeding concerned with the revocation of a professional license and

not a civil action for malpractice, which would require expert testimony as to a standard of care, *see* 2 *F. Harper & F. James, Torts* § 17.1, at 966 (1956), and thus we reject this argument. These witnesses were properly heard by the Board.

■ On appeal from the decision of an administrative agency the standard of appellate review is to examine the proofs to determine whether there is sufficient or substantial credible evidence in the record to support the agency's determination. Where such evidence appears, the determination should not be disturbed, absent some other defect such as discordance with legislative policy. *Campbell v. Department of Civil Serv.*, 39 *N. J.* 556, 562 (1963); *Atkinson v. Parsekian*, 37 *N. J.* 143, 149 (1962); *In re Comm'r of Banking & Insurance v. Parkwood Co., supra*, 98 *N. J. Super.* at 268.

■ Under this standard of review we are bound to find that the Board's determination as to the "grossly unprofessional conduct" of Heller was amply supported by the evidence. For the reasons stated, we affirm the Appellate Division's holding as to the validity of the revocations.

■ As to the "civil penalty" imposed by the Board, however, we reach a different result. The only provisions of the Pharmacy Act which deal with the imposition of monetary penalties are found in *N. J. S. A.* 45:14–37 and –38. Section 37 provides that any person who violates the act shall pay a "penalty" of from $25 to $50 for the first offense, from $50 to $100 for the second offense, and not less than $100 for each subsequent offense. Section 38 then provides in pertinent part:

(a) Any penalty imposed because of the violation of any provision of this chapter shall be collected and enforced by summary proceedings pursuant to the Penalty Enforcement Law (N. J. S. 2A:58–1 et seq.). Process shall issue at the suit of the board, as plaintiff, and shall be either in the nature of a summons or warrant.

In the present case it is obvious that the Board failed to follow the procedure prescribed by the statute in imposing this penalty, and failed as well to afford Heller notice, in

the complaint or otherwise, that it intended to consider such a penalty. Moreover, the Board made no attempt to follow the statutory schedule and impose separate penalties for each offense, but instead assessed the penalty based upon its own estimate of "the minimum amount of unjust profit" allegedly derived by Heller. For this there was no statutory warrant. Thus we need not pause to consider the propriety *vel non* of separate assessments, had they been made, on these multiple offenses. *Kingsley v. Wes Outdoor Advertising Co.,* 55 *N. J.* 336, 340 (1970), supplemented, 59 *N. J.* 182, 189 (1971).

It is enough to repeat the language of the dissenting opinion in the Appellate Division:

This [the imposition of a civil penalty] was done without any notice to the licensee that a monetary penalty was contemplated. The complaint alleging unprofessional conduct sought no such relief nor was any mention of any intention to assess a penalty made during the proceedings before the Board. Under these circumstances the licensee could not reasonably have been expected to have anticipated the imposition of a monetary penalty. He was thus deprived of an opportunity to present evidence in mitigation or bearing on his ability to pay. [150 *N. J. Super.* at 30].

In this posture the lack of procedural due process is conclusive. In *Fuentes v. Shevin,* 407 *U. S.* 67, 92 *S. Ct.* 1983, 32 *L. Ed.* 2d 556 (1972), Mr. Justice Stewart recalled that:

For more than a century the central meaning of procedural due process has been clear: "Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified." [407 *U. S.* at 80, 92 *S. Ct.* at 1994, 32 *L. Ed.* 2d at 569, quoting from *Baldwin v. Hale,* 68 *U. S.* (1 Wall.) 223, 233, 17 *L. Ed.* 531, 534 (1864)].

The viability of such requirement in circumstances such as the present case was well described by the court in *Department of Revenue v. Jamb Discount,* 13 *Ill. App.* 3d 430, 301 *N. E.* 2d 23, 27 (Ct. App. 1973):

Procedural due process requires that notice be given of the claim asserted. The right to a hearing includes not only the right to present evidence but also a reasonable opportunity to know what claims must be defended against and what consequences are proposed. * * * In order to be effectual, notice should be so full and clear as to disclose to persons of ordinary intelligence what is proposed. * * * The test is whether the defendant should have anticipated the effects and orders possible. [Citations omitted].

Moreover, such procedural due process is mandated by our Administrative Procedure Act, N. J. S. A. 52:14B-9.

We therefore affirm the judgment of the Appellate Division validating the revocations imposed, but reverse it as to the "civil penalty" element and set aside that part of the Decision and Order of the Board.

Judgment modified, and as modified, affirmed.

SCHREIBER, J. (dissenting and concurring in part). If the issue before this Court were whether in the abstract Heller was guilty of grossly unprofessional conduct as a pharmacist, I would have no hesitancy in joining the majority. Nor can there be any doubt that the Legislature could properly delegate to the Board of Pharmacy the authority to revoke or suspend a pharmacist's certificate because of grossly unprofessional conduct. That clearly is a sufficient guideline for an administrative agency. But these are *not* the questions raised in this case. Rather the problem to which we are directed is whether the Board of Pharmacy has been authorized to revoke a pharmacist's license for the reasons charged by the Board.

The Board has only those powers delegated to it by the Legislature — whether express, implied or incidental. If the power to revoke has not been entrusted to the Board, then no matter how strongly we feel that the Legislature should have taken that step, we must respect its judgment. The Board of Pharmacy, when created in 1901, was empowered to license pharmacists, L. 1901, c. 51, § 3, but it was not until 1934 that the Board was authorized to revoke a certificate, and then only for eight grounds, none

of which included grossly unprofessional conduct. *L.* 1934, *c.* 197, § 1. Conspicuous by its absence is any legislative history which suggests any different intent from that expressed in the statute with respect to the pharmacy board's license nullification power. Therefore careful analysis of *N. J. S. A.* 45:14–12 is in order.

The Board of Pharmacy's five count complaint charged Fred F. Heller with "grossly unprofessional conduct" in violation of *N. J. S. A.* 45:14–12 and sought to suspend or revoke his certificate to practice pharmacy. The complete provision reads as follows:

The board may refuse an application for examination or may suspend or revoke the certificate of a registered pharmacist or a registered assistant pharmacist for any of the following causes: When the applicant or registration is shown to have been obtained by misrepresentation or fraudulent means or when the applicant or registrant is guilty of chronic or ·persistent inebriety, or has been adjudged guilty of violating any State or Federal law or any law of the District of Columbia or of any territory of the United States relating to the practice of pharmacy, or relating to the dispensing of drugs, or has been convicted of a crime involving moral turpitude, or has impersonated an applicant for registration before the board or .has been convicted of knowingly, intentionally or fraudulently adulterating or causing to be adulterated drugs, chemicals or medicinal preparations or has sold or caused to be sold adulterated drugs, chemicals or medicinal preparations knowing, or having reason to know, that same were adulterated, or has procured or attempted to procure registration for another by misrepresentation or fraudulent means, and the board shall refuse an application for examination or suspend or revoke the certificate of a registered pharmacist or a registered assistant pharmacist when the applicant or registrant is shown to be addicted to the use of narcotic drugs, or has been convicted of violating any law of this or any other state or of the United States relating to narcotic drugs or has been .adjudicated an incompetent, or is shown to have any abnormal physical or mental condition which threatens the safety of persons to whom said applicant or registrant might sell or dispense prescriptions, drugs, chemicals, medicinal preparations or devices or for whom he might manufacture, prepare or package, or supervise the manufacturing, preparation or packaging of prescriptions, drugs, chemicals. medicinal preparations or devices. *In addition, the board may refuse an application for examination or may suspend or revoke the certificate of a registered pharmacist or a registered assistant pharmacist upon proof satisfactory to the board that such registered pharmacist*

or such registered assistant pharmacist is guilty of grossly unprofessional conduct and the following acts are hereby declared to constitute grossly unprofessional conduct for the purpose of this act:

a. Paying rebates or entering into an agreement for payment of rebates to any physician, dentist or other person for the recommending of the services of any person.

b. The providing or causing to be provided to a physician, dentist, veterinarian or other persons authorized to prescribe, prescription blanks or forms bearing the pharmacist's or pharmacy's name, address or other means of identification.

c. The promotion, direct or indirect, by any means, in any form and through any media of the prices for prescription drugs and narcotics or fees or for services relating thereto or any reference to the price of said drugs or prescriptions whether specifically or as a percentile of prevailing prices or by the use of the terms "cut rate," "discount," "bargain" or terms of similar connotation; but this shall not include the term nonprofit if such term is used by a nonprofit entity; and this paragraph shall not be construed or apply to have any effect with respect to sales made by pharmacists or pharmacies directly to physicians, dentists, veterinarians or other persons authorized to prescribe, or to hospitals, nursing homes, governmental agencies, or other institutions licensed under Title 30 of the Revised Statutes, as amended or to the advertising or issuance of trading stamps and similar devices in connection with the sale of said prescription drugs and narcotics.

d. The claiming of professional superiority in the compounding or filling of prescriptions or in any manner implying professional superiority which may reduce public confidence in the ability, character or integrity of other pharmacists.

e. Fostering the interest of one group of patients at the expense of another which compromises the quality or extent of professional services or facilities made available.

f. The distribution of premiums or rebates of any kind whatever in connection with the sale of drugs and medications provided, however, that trading stamps and similar devices shall not be considered to be rebates for the purposes of this chapter and provided further that discounts, premiums and rebates may be provided in connection with the sale of drugs and medications to any person who is 62 years of age or older. Before a certificate shall be refused, suspended or revoked, the accused person shall be furnished with a copy of the complaint and given a hearing before the board. Any person whose certificate is so suspended or revoked shall be deemed an unregistered person during the period of such suspension or revocation, and as such shall be subject to the penalties prescribed in this chapter, but such person may, at the discretion of the board, have his certificate reinstated at any time without an examination, upon application to the board. Any person to whom a certificate shall be denied by the board or whose certificate shall be suspended or revoked by the board shall have the right to review such action by appeal to the Appellate

Division of the Superior Court in lieu of prerogative writ. [Emphasis supplied].

The revocation authority vested in the Board by the statute applies to two major classes of misconduct. The first group enumerated in the first paragraph of the section refers to a host of grounds which fall into three general categories: (a) convictions of various crimes, such as knowingly selling adulterated drugs, (b) the pharmacist's physical or mental condition which threatens the safety of persons to whom drugs .may be sold, or (c) fraud or misrepresentation with respect to securing the pharmacist's certificate. The second group consists of acts which are defined to be grossly unprofessional conduct. The statute declares that "the following acts are hereby declared to constitute grossly unprofessional conduct for the purpose of this act: . . ." Then follow six proscribed activities. Concededly, Heller has not violated any of these.

Nowhere does it appear that this list should be considered as anything but exclusive. In effect the majority has amended the statute to read that "the following acts *among others* are hereby declared to constitute grossly unprofessional conduct." Its argument that the six proscribed activities are all of the same nature (at 306) supports the thesis that the Legislature intended the phrase "grossly unprofessional conduct" to be limited and restricted to that particular class of activities.

Recent legislative history buttresses this interpretation. A newly enacted statute provides that a valid ground for revocation of a license "to practice a health care profession, subject to regulation in this State, including the practice of pharmacy" exists where the licensee knows or should have known that the substances prescribed or dispensed are to be used for unauthorized purposes. *N. J. S. A.* 45: 1–13 [*L.* 1975, *c.* 382, effective March 3, 1976]. This act does not amend the definition of "grossly unprofessional conduct" in *N. J. S. A.* 45:14–12, but states a ground for

revocation generally applicable to health care professions, and particularizing pharmacists. Obviously, that specificity would have been unnecessary if the proscribed conduct had been subsumed by the definition in *N. J. S. A.* 45:14–12.

The majority contends that Heller, having violated *N. J. S. A.* 24:21–15(c), namely that no controlled dangerous substance of the codeine cough category may be dispensed other than for a valid and accepted medical purpose, must be guilty of grossly unprofessional conduct. In addition to ignoring the plain statutory language, the contention overlooks the fact that *N. J. S. A.* 45:14–12 expressly states that conviction of a law "relating to narcotic drugs" is a ground for revocation. But Heller has not been convicted of violating *N. J. S. A.* 24:21–15(c), a misdemeanor, *N. J. S. A.* 24:21–23, and revocation of his certificate prior to conviction is not justified. *See State Bd. of Medical Examiners v. Weiner,* 68 *N. J. Super.* 468 (App. Div. 1961), where it was held that although the State Board of Medical Examiners could suspend or revoke a license for conviction of a crime, it had no authority to suspend a doctor's license where the doctor had been indicted, but not convicted, for manslaughter for deaths allegedly due to improper injections.

There being no legislative history which throws any different light on the patently plain and unambiguous statutory language, I am constrained to follow that language. *Safeway Trails, Inc. v. Furman,* 41 *N. J.* 467, 478 (1964); *Myers v. Cedar Grove Tp.,* 36 *N. J.* 51, 61 (1961). This is especially so where a person will be forced to forego his profession and his livelihood is at stake. Fair process does not sanction license revocation on an *ad hoc* basis absent statutory underpinning. *See Boller Beverages, Inc. v. Davis,* 38 *N. J.* 138, 152 (1962).

In passing I note that the Legislature has not seen fit to vest in the Board of Pharmacy any broad rule-making power with respect to the suspension or revocation of pharmacists' certificates. The Legislature has empowered the

Board to promulgate rules and regulations in connection with other aspects of its regulatory authority. *See, e. g., N. J. S. A.* 45:14–17, rule and regulation making power for enforcement of *N. J. S. A.* 45:14–13 to 16; *N. J. S. A.* 45:14–26, rules and regulations for *N. J. S. A.* 45:14–23 to 25; *N. J. S. A.* 45:14–36, rules and regulations for *N. J. S. A.* 45:14–32 to 35; and *N. J. S. A.* 45:14–36.1, rules and regulations with respect to facilities, equipment and cleanliness in drug stores. In view of the absence of the Board's rule-making authority, the Court is not confronted with the issue of whether rule-making rather than *ad hoc* adjudicatory process is appropriate. *See Securities and Exchange Commission v. Chenery Corp.,* 332 *U. S.* 194, 201–202, 67 *S. Ct.* 1575, 1580, 91 *L. Ed.* 1995, 2002 (1947).

The Board of Pharmacy also revoked the permit of Carfred, Inc. to conduct a pharmacy, *N. J. S. A.* 45:14–32 and 33. The statutory basis for that revocation is not keyed to the "grossly unprofessional conduct" criteria applicable to an individual's license and no arguments have been advanced which would invalidate the Board's revocation of that permit.

I would reverse the order of the Board of Pharmacy in revoking Heller's license and affirm the Board's order in revoking Carfred, Inc.'s permit. I join in the majority's opinion and order that the "civil penalty" be set aside as to both Heller and Carfred, Inc.

*For affirmance as modified*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN and CLIFFORD and Judge CONFORD—6.

*Dissenting and concurring in part*—Justice SCHREIBER—1.