IN THE MATTER OF THE SUSPENSION OR REVOCATION
OF THE LICENSE OF RAYMOND KERLIN, D.V.M. TO
PRACTICE VETERINARY MEDICINE, DENTISTRY AND
SURGERY IN THE STATE OF NEW JERSEY.

Superior Court of New Jersey
Appellate Division

Submitted May 31, 1977—Decided June 22, 1977.

Before Judges BISCHOFF, MORGAN and KING.

*Messrs. Brener* and *Rosner,* attorneys for appellant (*Mr. Peter J. Cossman* on the brief).

*Mr. William F. Hyland,* Attorney General of New Jersey, attorney for respondent (*Ms. Erminie L. Conley,* Deputy Attorney General, of counsel; *Mr. Steven I. Kern,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

BISCHOFF, J. A. D. Respondent Raymond Kerlin, D. V. M., appeals from a decision of the Department of Law and Public Safety, Division of Consumer Affairs, Board of Veterinary Medical Examiners (Board), finding him guilty of "gross malpractice or gross neglect" in the practice of veterinary medicine, in violation of *N. J. S. A.* 45:16–6(j), and assessing a civil penalty in the amount of $250[1].

This action commenced with the filing of a complaint by the Attorney General of the State of New Jersey, alleging that respondent had violated the provisions of *N. J. S. A.* 45:16–6(j). A hearing was held, and at its conclusion the

[1] Authorized by *N. J. S. A.* 45:16–12, which provides:

Except as otherwise provided in this chapter, any person violating any provision of this chapter shall be liable to a penalty of not less than $50.00 nor more than $250.00 for each offense, to be sued for and recovered in the manner above set forth.

Board filed a decision which included the following findings of fact:

In the late morning of August 23, 1975, Mrs. Shirley Freund, 106 Annabelle Avenue, Trenton, New Jersey, accompanied by three of her children; Deborah, age 15, Brenda, age 10, and Janis, age 7 took a three week old kitten to their regular veterinarian, Dr. Armour C. Wood. D.V.M., 2222 South Broad Street, Trenton, New Jersey. The kitten was very lethargic, had white gums and tongue and sunken watery eyes. A kitten from the same litter had earlier that morning expired, having the same symptoms as the kitten taken to Dr. Wood's office. These symptoms indicate that the kitten taken to Dr. Wood's office was on the verge of death.

Dr. Wood was not in when the Freunds arrived. Debbie was told by Dr. Wood's receptionist that she should bring the kitten to Dr. Kerlin, the respondent herein. Dr. Kerlin was covering for Dr. Wood's patients and for the patients of several other veterinarians who did not have office hours on this day. At about 2 p.m., the Freunds arrived at Dr. Kerlin's office. Mrs. Freund told Debbie to go into the office and told her to find out if "its o.k. to be billed Friday" before the doctor began treatment of the kitten.

Debbie went into the office alone and told Mrs. Kerlin, Dr. Kerlin's office assistant for thirteen years, that her kitten, which Debbie held in her hands, was in need of treatment. Debbie was told to be seated and that Dr. Kerlin would be with her shortly. At the time of this discussion Debbie was visibly upset. Within moments after this discussion, Mrs. Freund along with her two other children entered the waiting area of Dr. Kerlin's office and seated themselves along with Debbie. There was no one else in the waiting area.

After about a five minute wait, Mrs. Kerlin opened the door to the examination room, which is adjacent to the waiting area of Dr. Kerlin's office, and stated that the doctor would now see the little girl with the kitten. Dr. Kerlin was in the examination room. Debbie, with the kitten, approached the door where Mrs. Kerlin was standing but before entering, asked Mrs. Kerlin if "this can be billed Friday." Mrs. Kerlin responded by saying "I'm sorry we don't have credit arrangements." As she spoke, Mrs. Kerlin closed the door between the examination room and the waiting area leaving herself and Dr. Kerlin in the examination room and leaving Debbie and her family in the waiting area. After the door was closed, Debbie immediately turned and left Dr. Kerlin's office. She was immediately followed by Mrs. Freund with Debbie's two sisters. Within ten to fifteen minutes after the Freund's left Dr. Kerlin's office, the kitten expired in Mrs. Freund's car.

■ ■ Accepting, as we do, this finding of fact as having support in substantial credible evidence in the record, *In re*

*Heller,* 73 *N. J.* 292, 374 *A.* 2d 1191 (1977); *Mayflower Securities v. Bureau of Securities,* 64 *N. J.* 85, 92–93 (1973)[2], we proceed to consider the basic issue — whether the conduct of respondent constitutes "gross malpractice or gross neglect" within the intent and meaning of *N. J. S. A.* 45:16–6(j). That statute provides:

The board may refuse to grant or may suspend or revoke a license to practice veterinary medicine, surgery and dentistry in this State, upon proof to the satisfaction of the board that the holder of such license:

\*    \*    \*    \*    \*    \*    \*    \*

j. Has been guilty of gross malpractice or gross neglect in the practice of veterinary medicine which has endangered the health or life of any person or animal.

The Board, in holding respondent guilty of a violation of *N. J. S. A.* 45:16–6(j), said:

\* \* \* It is grossly neglectful for a veterinarian to refuse to treat or allow his or her employees to refuse an animal presented for care without even taking the few moments necessary to determine the extent of an injury or illness and the need for treatment. In this case, a cursory examination of this kitten would have shown its grave condition calling for immediate steps to alleviate its suffering, including a humane euthanazation.

\*    \*    \*    \*    \*    \*    \*    \*

---

[2] Where disciplinary proceedings with respect to a profession or occupation are vested in an administrative agency in the first instance, the charges must be established by a fair preponderance of the believable evidence, *Atkinson v. Parsekian,* 37 *N. J.* 143, 149 (1962), and "the standard of appellate review is to examine the proofs to determine whether there is sufficient or substantial credible evidence in the record to support the agency's determination. Where such evidence appears the determination should not be disturbed, absent some other defect such as discordance with legislative policy." *In re Heller, supra,* 73 *N. J.* p. 309.

As to attorneys, charges of unethical conduct must be established by proof that is clear and convincing, *In re Pennica,* 36 *N. J.* 401, 419 (1962); *In re Rockoff,* 66 *N. J.* 394, 397 (1975), and jurisdiction to hear and determine such charges is vested in the Supreme Court. *N. J. Const.* (1947), Art. VI, § II, par. 3; *In re Logan,* 70 *N. J.* 222 (1976), on reh. 71 *N. J.* 583 (1976).

The Board holds that a veterinarian is expected to exhibit professional interest, compassion and empathy. Implied or known emergency cases must be evaluated as to authenticity.

\*  \*  \*  \*  \*  \*  \*  \*

Consistent with this public duty we have no hesitation in finding that a veterinarian who refuses or fails to make such preliminary inquiry and/or examination of an animal presented to his office for care as may be necessary to determine the existence or non-existence of the need for emergency care or humane treatment, whether to be performed by the veterinarian to whom the animal is presented or referred to a more appropriate facility for such treatment, substantially deviates from the standards of our profession which require that our members render not only skilled care but humane, concerned and compassionate care as well.

■ Preliminarily, we note this is not a civil action brought against a veterinarian for damages based on alleged malpractice or negligence resulting from a deviation from the appropriate standards of care. It is, instead, a disciplinary proceeding. Basic tort liability concepts are not applicable, nor is there any requirement for the production of expert testimony to establish the standard of care. To the extent that the standard of care becomes relevant and material, it may be supplied by members of the Board, which consists of five licensed or practicing veterinarians with at least ten years' experience. *N. J. S. A.* 45:16–1[3]; *In re Heller, supra.* 73 *N. J.* at 308.

The terms "gross malpractice" or "gross neglect" are not defined in the statute. For other purposes, "gross neglect" has been defined as including "a wanton or reckless disregard of the safety of others," *State v. Linarducci,* 122 *N. J. L.* 137 (Sup. Ct. 1939), or "an indifference to consequences," *State v. Gooze,* 14 *N. J. Super.* 277, 282 (App. Div. 1951).

Some courts regard [gross negligence] as simply a greater degree of negligence, differing only in quantity. Others think the difference is so great as to be one of kind, and such courts tend to assimilate "gross negligence" to "willful misconduct." "Heedlessness or reck-

---

[3]The membership of the Board may be augmented by the appointment of "public members," *N. J. S. A.* 45:1-2.2, as it was here.

less misconduct" has been treated as "gross negligence" on the one hand, and as "wanton misconduct" on the other. [2 *Harper & James, The Law of Torts*, § 16.15 at 952–953 (1956)]

Other courts have found it difficult to define gross neglect "because there was no test or language or factors to guide the courts' hand in marking out the division between ordinary and gross negligence on the scale of ascending or descending degrees of care." *Williamson v. McKenna,* 223 *Or.* 366, 388, 354 *P.* 2d 56, 66 (Sup. Ct. 1960).

██ ██ There can be no doubt that the Legislature could properly delegate to the Board the authority to suspend or revoke a license to practice veterinary medicine because of "gross malpractice or gross neglect in the practice of veterinary medicine." That clearly constitutes a sufficient guideline for an administrative agency. *In re Heller,* 73 *N. J. supra,* dissenting and concurring opinion of Justice Schreiber, at 311. In seeking to determine the legislative intent we should ascribe to the words used in a statute the meaning which is normal and in accord with common understanding. 1A *Sutherland, Statutory Construction* (4 ed. 1972), § 20.08 at 59.

██ It is obvious that the terms "neglect" and "malpractice," standing alone, import a deviation from normal standards of conduct. "Gross neglect" or "gross malpractice" suggest conduct beyond such wrongful action — how far beyond has been left to the judgment of the Board, subject, of course, to judicial review. *In re Heller, supra.*

Similar broad terms have been used as a basis for disciplinary action in other health related fields. A chiropodist may be disciplined for "[u]nprofessional, dishonorable or unethical conduct," *N. J. S. A.* 45:5–8; a hearing aid dispenser for "unethical conduct, ignorance, neglect, incompetence or inefficiency," *N. J. S. A.* 45:9A–17(c); a nurse for "dishonesty; unfitness or incompetency; conduct derogatory to nursing," *N. J. S. A.* 45:11–32; an orthoptist for "gross negligence" or "conduct * * * detrimental to the best in-

terest of the public," *N. J. S. A.* 45:12A–7(e) ; a pharmacist for "grossly unprofessional conduct," *N. J. S. A.* 45:14–12; a psychologist, for "[n]egligence or misconduct," *N. J. S. A.* 45:14B–24(f) ; an X-ray technician for "unethical conduct," *N. J. S. A.* 45:25–12(7). None of these terms has been defined by the Legislature, and they need not be.

In this case the Board expressed the opinion that a veterinarian should exhibit "professional interest, compassion and empathy" and "render not only skilled care, but humane concern and compassionate care as well." While such phrases express the ideal goal, and the attainment of that level of professional conduct is to be desired and encouraged, we cannot agree that the lack of these qualities, standing alone, establishes either "gross malpractice" or "gross neglect."

Furthermore, we reject the notion, implicit in the Board's conclusion, that disciplinary action can be grounded in vicarious liability. That concept has its proper place in the tort field but not in a disciplinary action. While disciplinary proceedings to revoke or suspend the license of a veterinarian or other professional are basically civil in nature, they may have penal implications (*e.g., N. J. S. A.* 45: 16–12: *N. J. S. A.* 45:14–37; *N. J. S. A.* 45:14–38), and dire consequences may flow from an adverse finding. *Cf. In re Pennica*, 36 *N. J.* 401 (1962) ; *In the Matter of Abrams*, 521 *F.* 2d 1094 (3 Cir.), *cert.* den. *sub nom.* 423 *U. S.* 1038, 96 *S. Ct.* 574, 46 *L. Ed.* 2d 413 (1975).

A veterinarian may indeed be responsible for the actions of an employee, if the actions are specifically authorized or directed, performed in his presence without objection; or ratified, adopted or approved by him, but absent proof of some participation by the veterinarian personally in the objectionable conduct, he cannot be subjected to censure, fine, suspension or revocation of his license for the act of his employee.

There is nothing in the findings of facts of the Board or in the record of the hearing to support a conclusion that respondent was aware of the exchange which occurred be-

tween Debbie and Mrs. Kerlin in time for him to have prevented the situation or to have taken remedial steps. There is no proof that Mrs. Kerlin was improperly trained or supervised. There is proof of a rude and indifferent attitude on her part, but this falls short of such conduct as warrants disciplinary action against respondent.

▮ Accepting the Board's definition that "it is grossly neglectful for a veterinarian to refuse to treat or allow his or her employees to refuse an animal presented for care without even taking the few moments necessary to determine the extent of an injury or illness and the need for treatment," there is no proof that (a) respondent refused to treat or examine, or (b) he did not allow his employees to examine or treat the kitten.

Neither the findings of fact nor the record upon which they were based suggest that Dr. Kerlin followed the policy of rejecting requests for emergency treatment on credit. On the contrary, the undisputed facts adduced by the defense were that whenever Dr. Kerlin was confronted with an emergency situation he administered treatment without consideration of immediate payment. Such was the experience of the several witnesses, each of whom had brought their animals to Dr. Kerlin for emergency care.

We conclude that the State has failed to establish that respondent was guilty of a violation of *N. J. S. A.* 45:16-6(j) or of conduct warranting disciplinary action, and the decision of the Board of Veterinary Medical Examiners is reversed.